J-A16036-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TERRENCE E. BABB, M.D. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GEISINGER CLINIC; PENN STATE GEISINGER HEALTH SYSTEM; ROBIN E. OLIVER, M.D.; AND MICHAEL CHMIELEWSKI, M.D. | : | No. 1229 MDA 2018 |
| | : | |
| | : | |
| APPEAL OF: GEISINGER CLINIC | : | |

Appeal from the Judgment Entered October 3, 2018
In the Court of Common Pleas of Centre County Civil Division at No(s):
98-1195

| | | |
|---|---|---|
| TERRENCE E. BABB, M.D. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GEISINGER CLINIC; GEISINGER HEALTH SYSTEM | : | No. 1314 MDA 2018 |
| | : | |

Appeal from the Judgment Entered October 3, 2018
In the Court of Common Pleas of Centre County Civil Division at No(s):
98-1195

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:      **FILED: OCTOBER 17, 2019**

Geisinger Clinic ("Geisinger") appeals from the order entered by the Court of Common Pleas of Centre County after a jury found in favor of Terrence E. Babb, M.D., on his breach of contract claim and awarded Dr. Babb

_____

\*   Former Justice specially assigned to the Superior Court.

$5.5 million in damages. Dr. Babb filed this cross-appeal, challenging the trial court's denial of his claim for pre-judgment interest. We affirm.

Our Court has reviewed this case on two occasions in its long procedural history that spans more than two decades. **See Babb v. Geisinger Clinic, et al.**, 981 MDA 2014 (Pa.Super. 2015) (unpublished memorandum) ("**Babb II**"); **Babb v. Centre Community Hospital**, 47 A.3d 1214 (Pa.Super. 2012) ("**Babb I**"). While our prior decisions provide detailed recitations of the background of this case, for the sake of simplicity, we set forth only the facts and procedural history that are necessary to resolve the instant appeal:

> In June 1995, Geisinger offered, and Dr. Babb accepted, employment as a staff physician for their OB/GYN Clinic in State College. Dr. Babb commenced his employment on September 1, 1995. At around the same time, Dr. Oliver was also hired as a staff physician for the OB/GYN Clinic. In July 1996, Geisinger hired Dr. Chmielewski as a third staff physician at the Clinic. Over time, the working relationship between Dr. Babb and his two colleagues deteriorated. Dr. Babb made professional complaints against Dr. Chmielewski. Subsequently, Dr. Oliver, Dr. Chmielewski and others made professional complaints against Dr. Babb. Pursuant to a routine annual performance review process, Dr. Babb was recommended for reappointment. However, the discord and additional targeted performance reviews culminated in Geisinger's decision to terminate Dr. Babb's employment.
>
> To that end, on or about May 16, 1997, Dr. Charles Maxin, Senior Vice President for Clinical Operations, and Dr. David Wolfe, Medical Director for Geisinger Medical Group, met with Dr. Babb and requested his resignation. Dr. Babb refused to resign and he was fired that same day. The termination was confirmed by letter dated May 19, 1997. [1]

_____

[1] The factual background becomes muddled as part of the procedural history of this case was excluded from the jury's consideration. As Geisinger had

*** 

During his employment with Geisinger, Dr. Babb enjoyed clinical privileges with [Centre Community Hospital (CCH)]. Upon his termination by Geisinger, those privileges were withdrawn because Dr. Babb no longer had malpractice insurance coverage. Dr. Babb subsequently obtained employment in Clearfield County.

On May 1, 1998, Dr. Babb initiated the instant action in the Court of Common Pleas of Centre County by filing a writ of summons against Geisinger, Dr. Oliver, and Dr. Chmielewski (Geisinger Defendants). [] On November 4, 1999, Dr. Babb filed a complaint in United States District Court for the Middle District of Pennsylvania against Geisinger, CCH, and others, alleging, *inter alia,* discrimination, antitrust violations, breach of contract, civil conspiracy to deny privileges, and interference with contract.

*** 

On September 14, 2001, the District Court, with Judge Muir presiding, granted defendants' motions for summary judgment, terminating all federal claims but declining to address Dr. Babb's state claims.

*** 

[O]n October 31, 2001, Dr. Babb filed a seven-count complaint in the still pending instant action against the Geisinger Defendants. On January 25, 2002, Dr. Babb filed an amended six-count complaint, adding CCH as a party and alleging the following causes of action. As against Geisinger, Dr. Babb sought monetary damages, alleging breach of contract (Count I), and illegal retaliation in violation the Pennsylvania Human Relations Act

_____

indicated Dr. Babb's termination was based in part on quality of care concerns, Geisinger provided Dr. Babb with a post-termination hearing pursuant to its Peer Review Fair Hearing Plan (Fair Hearing Plan) rather than its Involuntary Review Process set forth in employee policy #412. After receiving the Fair Hearing results, Geisinger was mandated to file a National Practitioner Data Bank (NPDB) Report on June 2, 1998. *See **Jacksonian v. Temple University Health System Foundation***, 862 A.2d 1275, 1278 (Pa.Super. 2004) (noting the Health Care Quality Improvement Act (HCQIA) "requires hospitals to report information to the Data Bank, and to request information from the Data Bank when physicians join a hospital and every two years thereafter. *See* 42 U.S.C. §§ 11133, 11135").

However, facts related to the post-termination hearings and the subsequent National Practitioner Data Bank (NPDB) report, are not relevant to this appeal, as the trial court excluded this evidence at Geisinger's request.

(Count VI). As against all defendants, Dr. Babb sought monetary damages, alleging defamation (Count II), intentional interference with contractual relations (Count IV), and civil conspiracy (Count V). In Count III, Dr. Babb also sought injunctive relief against Geisinger and CCH relative to the alleged defamation. *See* Dr. Babb's Amended Complaint, 1/25/02.

\*\*\*

On December 10, 2010, the Geisinger Defendants and CCH each filed a motion for summary judgment. The Geisinger Defendants and CCH sought summary judgment or partial summary judgment on [several] grounds[, including *inter alia*, … their claim] that they are covered by the [federal Health Care Quality Improvement Act (HCQIA), 42 U.S.C.A. § 11101, *et seq*.] and Pennsylvania's Peer Review Protection Act [(PRPA) immunity pursuant to 63 P.S. §§ 425.1-425.4, relative to Dr. Babb's claim for monetary damages in Counts I, II, IV, V, and VI. In addition,] [r]elative to Dr. Babb's Count III request for injunctive relief, the Geisinger Defendants and CCH allege the relief requested is unavailable as a matter of law because the Data Bank Report at issue was justified, privileged and mandated and an adequate remedy exists at law.

On May 12, 2011, the trial court issued an opinion and order granting summary judgment in favor of all defendants as to all counts and dismissed all claims with prejudice. The trial court based its grant of summary judgment for the counts seeking damages on the Geisinger Defendants' and CCH's claims of HCQIA immunity. [The trial court also found that injunctive relief was unavailable.]

\*\*\*

On June 9, 2011, Dr. Babb filed a timely notice of appeal.

On appeal, [in **Babb I**,] a panel of this Court affirmed in part and reversed in part the trial court's order. [In a published opinion authored by then-Judge (now Justice) Sallie Updike Mundy,[2] the] panel affirmed the trial court's grant of summary judgment in favor of Dr. Oliver, Dr. Chmielewski, and CCH on the basis of HCQIA immunity []. The panel, however, reversed the trial court's grant of summary judgment in favor of Geisinger on the basis of HCQIA immunity because there existed an issue of material fact regarding Geisinger's compliance with 42 U.S.C.A. § 11112(a).

---

[2] The Honorable Sallie Updyke Mundy subsequently became a commissioned Justice on the Supreme Court of Pennsylvania in 2017.

- 4 -

The panel also declined to review additional issues relating to Geisinger's summary judgment motion that were not addressed by the trial court [] and remanded the case for further proceedings.

On remand, the trial court ordered Geisinger to file another summary judgment motion and brief relating only to issues that the trial court did not address in its May 12, 2011 order. [] On November 4, 2013, Geisinger filed its motion for summary judgment, [raising numerous additional claims, which included, *inter* alia, its argument that it] was entitled to summary judgment as a matter of law, because Section 425.3(a) of the PRPA, 63 P.S. § 425.3(a), rendered Geisinger immune from liability. [Further,] Geisinger argued that Dr. Babb's breach of contract claim failed as a matter of law, because Dr. Babb was an at-will employee who could be terminated with or without cause.

\*\*\*

On February 24, 2014, the trial court issued an opinion and order, granting summary judgment in favor of Geisinger.

\*\*\*

Regarding the peer review immunity under PRPA, the trial court determined Geisinger was immune from liability for money damages under Section 425.3(a). With respect to Dr. Babb's breach of contract claim, the trial court concluded that he was an at-will employee who was terminated for cause and that Geisinger followed proper post-termination procedures as outlined in Dr. Babb's practice agreement.

**Babb II**, 981 MDA 2014, at *1-7 (footnotes and some citations omitted).

In **Babb II**, this Court filed an unpublished decision authored by the Honorable Victor Stabile, affirming the trial court's grant of summary judgment in most respects, including its decision to grant Geisinger immunity under Section 425.3(a) of the PRPA, which provides protection for "providing relevant and truthful information to peer review committees." **Cooper v. Delaware Valley Med. Ctr.**, 539 Pa. 620, 632, 654 A.2d 547, 553 (1995).

However, this Court reversed the trial court's decision to grant summary judgment on Appellant's breach of contract claim, finding that "a material

issue of fact exists as to whether (1) Dr. Babb was an at-will employee, (2) Geisinger afforded Dr. Babb [] an opportunity to review the underlying grievances prior to termination and (3) Geisinger had any contractual obligations to Dr. Babb that Geisinger failed to honor during the course of Dr. Babb's employment with Geisinger." **Babb II**, 981 MDA 2014, at *18. As a result, this Court remanded the case for resolution of these issues.

Before the commencement of opening statements at trial, Geisinger formally withdrew its immunity defense under the HCQIA. Thereafter, the parties disagreed on whether evidence of post-termination hearings and Geisinger's compliance with HCQIA standards could be admitted at trial. The trial court ruled that the parties should not discuss the post-termination hearings or the NPDB Report. Notes of Testimony (N.T.), Trial, 3/5/18, at 9.

At the conclusion of the evidence, Geisinger moved for a directed verdict, which the trial court denied. Thereafter, the jury found Geisinger breached its contract and awarded Dr. Babb $5.5 million in damages. Geisinger filed a post-trial motion, seeking judgment notwithstanding the verdict (JNOV) or a new trial. Dr. Babb filed a post-trial motion, asking for an award of pre-judgment interest. On June 29, 2018, the trial court denied both parties' post-trial motions. Both parties appealed.[3]

_____

[3] While the parties purported to appeal from the denial of post-trial motions, an order denying post-trial motions is not appealable until the entry of final judgment. **Prime Medica Assoc. v. Valley Forge Ins. Co.**, 970 A.2d 1149 (Pa.Super. 2009). However, "a final judgment entered during the pendency

Geisinger raises the following issues on appeal:

A. Whether the trial court erred when it failed to find the prior immunity determination necessitated entry of judgment in Geisinger's favor.

B. Whether the trial court erred when it failed to find Babb was an at-will employee where he failed to rebut the presumption by establishing any exception.

C. Whether the trial court erred when it found sufficient evidence existed to establish Babb's breach of contract claim.

D. Whether the trial court erred when it failed to provide Geisinger's requested jury instructions on the law of at-will employment.

E. Whether the trial court erred when it failed to provide Geisinger's requested jury instructions regarding damages?

F. Whether the trial court erred when it denied Geisinger's (a) motion *in limine* and (b) requested jury instructions pertaining to collateral estoppel and law of the case.

G. Whether the trial court erred when it failed to preclude the testimony of Charles Artz?

H. Whether the trial court erred when it found sufficient evidence existed to support the jury's award of $5.5 million and failed to reduce the jury's award.

Geisinger's Brief, at 6 (reordered for ease of review). In addition, *amicus curiae* briefs have been filed by the American Medical Society (AMA), the

_____

of an appeal is sufficient to perfect appellate jurisdiction." **Id**. (citation omitted). As Geisinger complied with this Court's directions to praecipe the trial court prothonotary to enter judgment and file a certified copy of the docket reflecting entry of the judgment, we treat the notices of appeal as filed after the entry of judgment on October 3, 2018. **See** Pa.R.A.P. 905(a)(5).

Pennsylvania Medical Society ("Medical Society"), and the Association of American Physicians and Surgeons (AAPS) in support of Dr. Babb.

On cross-appeal, Dr. Babb argues that the trial court abused its discretion in refusing to award any prejudgment interest to the jury's verdict.

**Geisinger's Motion to Quash**

As an initial matter, we review Geisinger's motion to quash Dr. Babb's brief along with his supplemental reproduced record. We note with displeasure that Dr. Babb's counsel, Atty. Andrew Barbin, has demonstrated repeated disregard of our Rules of Appellate Procedure. While Atty. Barbin's noncompliance did not lead this Court to quash Dr. Babb's prior appeals, then-Judge (now Justice) Mundy wrote a concurring statement to admonish counsel for his noncompliance. *Babb II*, 981 MDA 2014, at *8-9; *Babb II*, 981 MDA *18-19 (Mundy, J., concurring statement); *Babb I*, 47 A.3d at 1230 n.1.

Nevertheless, although Dr. Babb's brief contains technical violations of our rules of appellate procedure in his role as appellee, we cannot conclude that such non-compliance hampers our review. *See Green v. Green*, 69 A.3d 282, 286 (Pa.Super. 2013) (stating that "[i]f the failure to comply with the rules of appellate procedure does not impede review of the issues or prejudice the parties, we will address the merits of the appeal"). With respect to the cross-appeal, Dr. Babb's brief focuses on one issue, which is sufficiently identified and developed with citation to authority and corresponding analysis.

However, Geisinger points out that Dr. Babb's brief improperly refers to confidential information. On October 30, 2018, the parties filed a joint

application to seal a portion of trial testimony in which the parties discussed a partial settlement of the case. On November 5, 2018, this Court granted the application and directed the prothonotary to seal the relevant portion of the trial transcript. Nevertheless, Atty. Barbin's brief inexplicably and in violation of a court order, refers to the confidential discussions between counsel contained in the sealed transcript.

This Court held that "[a]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." ***Hutchison by Hutchison v. Luddy***, 611 A.2d 1280, 1292 (Pa.Super. 1992) (citations omitted). As such, the inclusion of this information in Dr. Babb's brief violates our sealing order, we grant Geisinger's motion in part and strike portions of Dr. Babb's brief on pages 8, 49, and 71 that reference the confidential information.

**<u>Legal Implications of this Court's Prior Immunity Determination</u>**

Geisinger first claims the trial court erred in failing to find this Court's prior immunity determination necessitated entry of judgment in Geisinger's favor. Geisinger asserts the law of the case doctrine precludes "relitigation of questions previously decided by the same or a higher court in an earlier phase of the matter." Geisinger's Brief, at 95. However, Geisinger mischaracterizes the previous holdings of this Court and the trial court.

Geisinger initially raised two immunity defenses based on the federal HCQIA statute and Pennsylvania's PRPA statute. In ***Babb I***, this Court reversed the trial court's entry of summary judgment based on Geisinger's

claim of HCQIA immunity. The HCQIA provides that "anyone participating in or aiding a professional review body shall not be held liable in monetary damages for claims arising out of the peer review process." ***Manzetti v. Mercy Hosp. of Pittsburgh***, 565 Pa. 471, 483, 776 A.2d 938, 945 (2001) (citing 42 U.S.C. § 11111(a)(1)).[4] In this case, the trial court found there was an issue of material fact as to whether Dr. Babb met his burden to show that

---

[4] More specifically,

> The HCQIA was created by the United States Congress in order "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. (1986). In order to further the candor necessary to such a process, the Congress inserted immunity provisions in the HCQIA. … In order to qualify for this immunity, a professional review action must be taken—
>
> (1)  in the reasonable belief that the action was in the furtherance of quality health care,
> (2)  after a reasonable effort to obtain the facts of the matter,
> (3)  after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4)  in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).
>
> 42 U.S.C. § 11112(a). The HCQIA further states that a professional review action shall be presumed to have met these four standards. The plaintiff has the burden to overcome this presumption by a preponderance of the evidence. ***Id.***

***Manzetti,*** 565 Pa. at 483, 776 A.2d at 945 (2001).

"either the peer review process or Geisinger's belief that its actions were in furtherance of patient care was unreasonable." ***Babb I***, 47 A.3d at 1227 (citations omitted). As this Court found it was "for a jury to decide whether Geisinger is entitled to HCQIA immunity," the case was remanded for the resolution of the remaining issues in Geisinger's summary judgment motion.

On remand, the trial court found that Geisinger was entitled to immunity under Pennsylvania's PRPA. The PRPA "provid[es] for the increased use of peer review groups by giving protection to individuals and data who report to any review group." ***Id.*** (quoting 63 P.S. § 425.1).[5] In this case, the trial court

---

[5] Section 425.3 of the PRPA provides:

**§ 425.3** Immunity from liability

(a) Notwithstanding any other provision of law, *no person* providing information to any review organization shall be held, by reason of having provided such information to have violated any criminal law, or to be civilly liable under any law, unless:

(1) such information is unrelated to the performance of the duties and functions of such review organizations, or

(2) such information is false and the person providing such information knew, or had reason to believe, that such information was false.

(b)(1) *No individual* who, as a member or employee of any review organization or who furnishes professional counsel or services to such organization, shall be held by reason of the performance by him of any duty, function, or activity authorized or required of review organizations, to have violated any criminal law, or to be civilly liable under any law, provided he has exercised due care.

- 11 -

noted that, unlike the HCQIA, which focuses in part on the reasonableness of the peer review proceeding, the PRPA provides protection against "liability for statements made to a peer review organization provided they are not knowingly false and are made with due care." Order, 2/24/14, at 10. As such, the trial court found that Geisinger was entitled to PRPA immunity, indicating that Dr. Babb's vague allegations and speculation did not state a claim with specificity to circumvent the immunity provisions of the PRPA.

In **Babb II**, this Court affirmed the trial court's decision in part, upholding its decision to grant Geisinger immunity under the PRPA. However, the **Babb II** Court reversed and remanded the case for further review of Dr. Babb's breach of contract claim. Upon remand, Geisinger decided to waive its HCQIA immunity defense and successfully moved to exclude all evidence related to the post-termination hearings. At trial, the jury found in favor of Dr. Babb on his breach of contract of claim.

In the instant appeal, Geisinger asserts that this Court's decision in **Babb II** affirming the grant of PRPA immunity "necessitated entry of

_____

(2) The provisions of paragraph (1) of this subsection shall not apply with respect to any action taken by any individual if such individual, in light of such action, was motivated by malice toward any person affected by such action.

63 P.S. § 425.3 (emphasis added). We note that our Supreme Court has clarified that hospitals, as corporate *persons*, may be granted immunity under Section 425.3(a) of the PRPA for "providing relevant and truthful information to peer review committees." **Cooper**, 539 Pa. at 632, 654 A.2d at 553. In contrast, hospitals are not protected by the immunity provisions set forth in Section 425.3(b), which only protects *individuals*. **Id**.

judgment in favor of Geisinger" with respect to the breach of contract claim and "prohibited the entry of **any** award in favor of [Dr.] Babb." Geisinger's Brief, at 95. Although Geisinger claims that the panel's decision in **Babb II** provided Geisinger complete immunity from suit under the PRPA, Geisinger fails to recognize the panel in **Babb II** did not apply the PRPA immunity provisions to Dr. Babb's breach of contract claim, which was based on his allegation that Geisinger failed to give him notice and opportunity to be heard before his termination.

Although the panel's decision in **Babb II** did not specify the scope of the grant of PRPA immunity, it affirmed the trial court's decision that indicated that the PRPA provides protection against "liability for statements made to a peer review organization." Order, 2/24/14, at 10. Geisinger does not address the trial court's conclusion that the PRPA did not provide Geisinger immunity for Dr. Babb's breach of contract claim, which was "not related to the information provided to any review organization." Trial Court Opinion (T.C.O.), 6/29/18, at 5. Accordingly, we find no merit to Geisinger's claim that our previous precedent precluded the trial court from entering judgment on Dr. Babb's breach of contract claim.

### Challenge to the Denial of Geisinger's Request for JNOV

Second, Geisinger argues that the trial court erred in denying its motion for JNOV. We are guided by the following standard:

> An appellate court will reverse the trial court's decision to grant or deny JNOV only when it finds an abuse of discretion or an error of law. *See Rost v. Ford Motor Co.*, 637 Pa. 625, 151 A.3d 1032,

1042 (2016) (citing *Reott v. Asia Trend, Inc.*, 618 Pa. 228, 55 A.3d 1088, 1093 (2012)]. An abuse of discretion does not result from a mere error of judgment. *See, e.g., Humphreys v. DeRoss*, 567 Pa. 614, 790 A.2d 281, 283 (2002); *Kelly v. Cty. of Allegheny*, 519 Pa. 213, 546 A.2d 608, 610 (1988); *Echon v. Pa. R. Co.*, 365 Pa. 529, 76 A.2d 175, 178 (1950); *Mielcuszny v. Rosol*, 317 Pa. 91, 176 A. 236, 237 (1934). An abuse of discretion exists where the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record. *Echon*, 76 A.2d at 178.

A court may enter JNOV on one of two bases. The first is where a movant is entitled to judgment as a matter of law because, upon reviewing the record and deciding all factual inferences adverse to the movant, the law nonetheless requires a verdict in his favor. *Moure v. Raeuchis,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992). The second is where "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.*; *see also Birth Ctr. v. St. Paul Companies, Inc.*, 567 Pa. 386, 787 A.2d 376, 383 (2001). In such a case, the court reviews the evidentiary record and concludes based on the evidence that a verdict for the movant was beyond peradventure. *Moure*, 604 A.2d at 1007. In reviewing the lower court's decision, we must read the record in the light most favorable to the verdict winner and afford him the benefit of all reasonable inferences. *Id.*

\*\*\*

Moreover, JNOV should only be entered in a clear case with any doubts resolved in favor of the verdict winner. An appellate court "stands on a different plane" than a trial court, and it is the trial court that has the benefit of an "on-the-scene evaluation of the evidence." *Exner v. Gangewere*, 397 Pa. 58, 152 A.2d 458, 472-73 (1959). As such, while the appellate court may disagree with a verdict, it may not grant a motion for JNOV simply because it would have come to a different conclusion. Indeed, the verdict must stand unless there is no legal basis for it. *Birth Ctr.*, 787 A.2d at 383.

***Menkowitz v. Peerless Publications, Inc.,*** \_\_\_Pa.\_\_\_, 211 A.3d 797, 804

(2019).

- 14 -

Geisinger claims the trial court should have granted JNOV as Dr. Babb failed to (1) rebut the presumption that he was an at-will employee and (2) present sufficient evidence to support a breach of contract claim. With the aforementioned standard in mind, we review the record before this Court.

At trial, Dr. Babb testified and presented the testimony of his wife, Kimberly Babb, and his expert, Charles Artz, as well as the depositions of Dr. Maxin, Dr. Wolfe, and Lee Myers.[6] Dr. Babb claimed Geisinger breached his contract by terminating his employment without notice and opportunity to be heard. Dr. Babb asserted that he was unable to challenge the underlying allegations or Geisinger's method of termination, which resulted in devastating effects on his career, such that Dr. Babb was unable to obtain equivalent full-time work in his specialty for twenty years after his termination.

Before being hired by Geisinger, Dr. Babb practiced medicine for seven years and was board-certified in obstetrics/gynecology (OB/GYN) as well as family medicine. On May 11, 1995, Geisinger sent an offer letter to Dr. Babb for the position of OB/GYN associate. On June 8, 1995, Dr. Maxin issued a revised offer incorporating changes Dr. Babb requested, including that his proposal that his annual base salary of $210,000 would "be guaranteed for two years," instead of one year. Revised Offer, 6/8/95, at 1. The revised offer stated that Dr. Babb would be eligible for incentive payments based on the excess of 47.5% of net receipts of his billings over his base salary. The

---

[6] Both Dr. Maxin and Myers served as Senior Vice-President of Operations, partnering in the role as a doctor and an administrator. N.T. 3/8/18, at 5-6.

revised offer outlined other benefits, including but not limited to, the payment of Dr. Babb's malpractice insurance, a yearly $3,500 allowance for continuing education and certification requirements, and a $30,000 loan forgivable over four years.[7] Dr. Babb's start date was set at September 1, 1995.

The revised offer required Dr. Babb to sign the Practice Agreement, which outlined a two-year non-compete agreement.  The Practice Agreement also indicated that "[p]rior to any termination initiated by Geisinger for or without cause, however, [Dr. Babb] shall be afforded an opportunity for a review of the underlying circumstances therefore, pursuant to Geisinger's published guidelines governing such reviews, as amended an in effect from time to time."  Practice Agreement, at 1.  The revised offer stated that the Practice Agreement "along with the Employee Benefits Summary, the Professional Staff Handbook and this letter form the basis of the agreement between you and Geisinger."  Revised Offer, 6/8/95, at 1.  Dr. Babb testified that he would not have accepted Geisinger's offer for employment if Geisinger could terminate him without providing any review, given his restrictive covenant.  N.T. 3/5/18, at 125-27, 175-176.

Dr. Babb and his colleagues, Dr. Oliver and Dr. Chmielewski, were tasked with starting an OB/GYN clinic in State College.  However, the three

---

[7] The revised offer also stated that Dr. Babb would be permitted to participate in selecting individuals for leadership in the OB/GYN department as well as participate in the hiring and firing of department physicians. Dr. Babb admits he could not prove damages on these breaches, but argued these claims were relevant to show Geisinger's disregard of the parties' contract.

physicians experienced difficulty in developing a working relationship. Dr. Babb confronted Dr. Chmielewski with respect to the quality of care he provided in a particular situation. Dr. Oliver and Dr. Chmielewski made formal complaints to Geisinger's administrative staff about Dr. Babb's untimeliness in completing charts and inability to run on schedule with appointments.

On October 21, 1996, Dr. Wolfe and Myers met with Dr. Babb to discuss his "confrontational style," "inability to work effectively with diverse or heterogeneous perspectives," and his "poor performance with documentation [and] billing." Plaintiff's Exhibits 11, 12. Dr. Babb was notified that Dr. Oliver was appointed lead physician at the clinic; Dr. Babb felt this selection violated his contract as he did not participate in this decision, but was notified a month after the decision was made. N.T., 3/5/18, at 157, 169; N.T., 3/6/18, at 81.

Dr. Oliver and Dr. Chmielewski continued to present their concerns with Dr. Babb to Geisinger's administration. On February 9, 1997, Dr. Oliver entered Dr. Babb's office to retrieve and photocopy several charts she felt were incomplete. On March 11, 1997, in meeting with Dr. Oliver, Dr. Maxin discussed hiring an "outside physician" to conduct a random review of the charts of all three doctors; however, this review never occurred. Plaintiff's Exhibit 15; N.T., 3/5/18, at 159-60, 3/6/18, at 187, 203-204. Dr. Maxin admitted that the subsequent review of Dr. Babb's charting efficiency was conducted on charts chosen by Dr. Oliver and Dr. Chmielewski. N.T. 3/6/18, at 194. Dr. Maxin indicated in his meeting note that Dr. Babb's response had been "less confrontational, documentation improving." Plaintiff's Exhibit 15.

On May 1, 1997, Dr. Wolfe conducted Dr. Babb's annual performance review in which he acknowledged that Dr. Babb's ambulatory chart review was "not satisfactory" but that his patient concern reports, patient satisfaction, and utilization review were "satisfactory." Supervising Physician's Report, Plaintiff's Exhibit 17.1. Despite acknowledging Dr. Babb's charting deficiencies, Dr. Wolfe "recommended" Dr. Babb's "reappointment to the professional clinical staff of Geisinger." *Id*. This reappointment was approved by Dr. Maxin, as well as Geisinger's committees and boards of directors. The reappointment data sheet indicated that Dr. Babb's "reappointment period [ran from] July 1, 1997 to June 30, 1999." Plaintiff's Exhibit 17.1, Reappointment Data Sheet.

Shortly after this performance review, Dr. Babb traveled to Romania to participate in a medical mission. In Dr. Babb's absence, on May 5, 1997, Dr. Oliver and Dr. Chmielewski submitted a letter to Myers, indicating that their concerns about Dr. Babb continued to exist for six months despite efforts of Geisinger's administration. As such, the doctors requested that Geisinger relocate them to another office in State College, separate from Dr. Babb.

Geisinger's administration decided it would not be feasible to relocate the doctors; instead, the administration decided to separate Dr. Babb from the clinic. On May 15, 1997, Dr. Maxin, Dr. Wolfe, and Myers sent an internal communication to Geisinger personnel indicating that "[e]ffective 5:00 p.m. Friday, May 15, 1997, Dr. Terry Babb is no longer associated with Geisinger Clinic and is no longer a GHP provider." Internal Communication, 5/15/97, at

1 (Plaintiff's Exhibit 22). The communication stated Dr. Babb's patients would be notified and given an option to transfer to another physician. Further, the communication stated that Dr. Babb had been "instrumental in the development of our OB/GYN program [and that his] efforts are greatly appreciated." *Id*. However, at that point, Geisinger administration had not discussed the termination with Dr. Babb and did not send him the internal communication concerning his termination. N.T., 3/5/18, at 136-38.

The following day, on May 16, 1997, when Dr. Babb was called to meet with Dr. Maxin and Dr. Wolfe, he had a feeling that something was wrong as Dr. Wolfe repeatedly attempted to contact him. Dr. Babb asked if he could have his wife, head nurse, or attorney present; all these requests were denied. *Id*. at 229. Dr. Maxin and Dr. Wolfe gave him the option of resigning or being terminated, but refused to give any reason for this ultimatum. Dr. Babb viewed resigning as abandoning his patients, as he had a patient in active labor and other surgeries scheduled the next week. Dr. Babb claimed that when he refused to resign, Dr. Maxin and Dr. Wolfe threatened to go through his charts and find a reason to fire him *Id*. at 229-35. Dr. Maxin and Dr. Wolfe gave Dr. Babb a copy of Geisinger's involuntary termination policy and asked him to leave the hospital. Plaintiff's Exhibit 23.

The next day, on May 17, 1997, Dr. Wolfe sent Centre Community Hospital a letter confirming Dr. Babb's termination and indicating he was no longer covered by its malpractice insurance. Plaintiff's Exhibit 24. On May 19, 1997, Dr. Wolfe and Dr. Maxin sent Dr. Babb a letter summarizing their

meeting and noting their request for Dr. Babb's resignation was his "failure to develop a working relationship with [his] colleagues, quality of care concerns, inadequate medical record keeping and unacceptable behavior in the clinic." Plaintiff's Exhibit 25. The letter set forth steps Dr. Babb needed to take to trigger a post-termination review. As stated above, the parties did not present the jury with any evidence with respect to the post-termination hearings.

After his termination, Dr. Babb received the results of his Ambulatory Medical Record Review, an annual compliance review of a random sampling of each physician's reports. The Geisinger Health Plans Quality Improvement Committee agreed on a threshold of 70% compliance for each doctor. Dr. Babb's mean score for performance in this review was determined to be 89.58% for 1996; the mean score for all physicians was 90.15%. *See* Plaintiff's Exhibit 28. N.T., 3/5/18, at 156-57. Dr. Babb admitted that he was behind in his charting responsibilities at the time of his termination, but suggested that all three doctors in the clinic had incomplete chart dictations as the office "was out of control." *Id*. at 190. Dr. Babb also admitted that he had a hard time refusing patients' requests to be seen by a physician even if it disrupted his schedule. *Id*. at 191-92.

Dr. Babb claimed that Geisinger's breach caused him significant damage; specifically, Dr. Babb noted the loss of his $210,000 salary as well as the gained expenses of malpractice insurance, costs related to maintaining his license, as well as the $19,000 balance of the loan Geisinger extended upon his hiring date. N.T., 3/5/18, at 169-71, 178-79, 234. Dr. Babb had

extreme difficulty finding employment, as he had to disclose the termination in applying for new positions. While Dr. Babb was employed at Clearfield Hospital from 2007-2014, he left that position as his purchase of malpractice insurance was cost-prohibitive. N.T. 3/6/18, at 115-116. Dr. Babb testified that he was not able to secure a full-time position for many years, but had to work at different locations across the country in *locum tenens* positions, which were available when a hospital lost a doctor or needed additional help; Dr. Babb eventually obtained full-time work in Sitka, Alaska. *Id*. at 119, 137.

Dr. Babb's wife, Kimberly Babb, who handled the couple's finances, testified that there were several years after Dr. Babb's termination in which the couple's net income was negative. N.T. 3/6/18, at 130. She recalled Dr. Babb's malpractice insurance ranged from about $28,000 to $60,000 a year. *Id*. at 131. Kimberly also indicated that she assisted her husband in attempting to apply for other positions and in obtaining medical licenses to practice in other states. *Id*. at 139. Dr. Babb also submitted into evidence twenty years of his tax returns, which he jointly filed with Kimberly.

In addition, Dr. Babb presented the testimony of Atty. Charles Artz, who the trial court accepted as an expert in the healthcare field and healthcare processes of discipline and investigation. N.T. 3/7/18, at 17. Atty. Artz admitted it is common for doctors to fall behind in charting responsibilities; at the time of Dr. Babb's termination, doctors would dictate charting information on cassette recordings that were later transcribed as hand-written documents. *Id*. at 35. Atty. Artz opined that it was "highly irregular" for Geisinger to

employ "secretive" methods to investigate claims against a physician instead of using peer review committees. *Id*. at 33. Artz claimed that it would be unfair for the individual who brought a complaint against a doctor to select charts to be evaluated by a third-party reviewer; Atty. Artz noted that hospitals typically perform a yearly systematic sampling of all doctors' charts. *Id*. at 39-40. Atty. Artz confirmed that Dr. Babb's 1996 ambulatory medical record review score of 89.58% was excellent. *Id*. at 41-43.

Moreover, Atty. Artz opined that based on his review of the documents related to Dr. Babb's hiring, "Geisinger had a legal and contractual duty and an obligation to give Dr. Babb full notice of everything he was being accused of and the opportunity to provide a detailed response to what they were accusing him of." *Id*. at 44-45. Atty. Artz asserted that a doctor's termination affects his ability to compete with others for employment and has lasting effects throughout the physician's career. *Id*. at 46-47.

Geisinger presented the testimony of Dr. Oliver and Dr. Maxin to show Dr. Babb was an at-will employee who received sufficient notice and opportunity to be heard to satisfy his contract. Dr. Oliver asserted that Dr. Babb's failure to keep up charting responsibilities was negatively impacting the clinic as Dr. Babb would keep incomplete charts in his office, making it difficult for the other doctors to locate the information to provide subsequent care to these patients. N.T. 3/7/18, at 145-48, 154. After Dr. Oliver was made team leader, she had several conversations with Dr. Babb about his documentation issues, after which Dr. Babb responded confrontationally and

would not acknowledge or correct the issues. *Id*. at 142-43. In February 2017, Dr. Oliver made photocopies of some of Dr. Babb's charts to have proof of her concerns. *Id*. at 148. When it appeared there would be no resolution of their complaint, Dr. Oliver and Dr. Chmielewski asked to be relocated to a practice separate from Dr. Babb; Dr. Oliver testified that the request was sincere and her goal was not Dr. Babb's termination. *Id*. at 155-58.

Dr. Maxin admitted that he refused Dr. Babb's request to delay his termination and gave Dr. Babb the choice between resignation or termination. Dr. Maxin admitted in a prior deposition that Geisinger's administration did not discuss any other disciplinary measures other than terminating Dr. Babb. N.T. 3/6/18, at 197. Dr. Maxin never investigated Dr. Babb's allegations of Dr. Chmielewski's unprofessional practices and never sought Dr. Babb's perspective on any of the complaints against him. Both Dr. Maxin and Dr. Wolfe conceded that Dr. Babb was never given any information that would lead him to conclude that his job would be in jeopardy if he did not follow Dr. Oliver's instructions as clinical leader. N.T. 3/6/18, at 199-203, 3/7/18, at 92. When asked if this lack of notice was fair to Dr. Babb, Dr. Wolfe stated, "we often don't get to choose what's fair in life." N.T. 3/7/18, at 98.

### Denial of JNOV – At-will employment

Geisinger first argues that the trial court erred in failing to grant JNOV, as Dr. Babb was an at-will employee that could be fired with or without cause. It is well-established that "[t]he presumption under Pennsylvania law is that all employment is at-will, and, therefore, an employee may be discharged for

any reason or no reason." ***Luteran v. Loral Fairchild Corp.***, 688 A.2d 211,

214 (Pa.Super. 1997) (quoting ***Scott v. Extracorporeal, Inc.,*** 545 A.2d 334

(Pa.Super. 1988)). In resolving similar claims, this Court has provided:

> As a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." ***Luteran***, 688 A.2d at 214 (citation omitted). "'The ***sine qua non*** of the presumption is that except in rare instances, discharge will not be reviewed in a judicial forum.'" ***Id.***, quoting ***Scott v. Extracorporeal, Inc.***, 376 Pa.Super. 90, 545 A.2d 334, 336 (1988).
>
> In order to rebut the presumption of at-will employment, a party must establish one of the following: (1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception.

> ***Luteran***, 688 A.2d at 214 (citation omitted).

***Rapagnani v. Judas Co.***, 736 A.2d 666, 669 (Pa.Super. 1999).

Although the parties primarily dispute whether Dr. Babb could rebut the

presumption of at-will employment based on the aforementioned factors, we

must not overlook evidence of the intent of the contracting parties.

> "Where an employment arrangement does not contain a definite term, it will be presumed that the employment at-will rule applies. Generally, an employment contract for a broad, unspecified duration does not overcome the presumption of an at-will employment. Definiteness is required." ***Id.*** at 670 (quotations and citations omitted). ***When considering a purported employment contract, "the courts must remain flexible and not allow the [at-will] presumption to foreclose proof of the parties' intent. Though the rule is a procedural safeguard, a court's primary task is to ascertain and enforce [the parties'] intent***." ***Greene v. Oliver Realty,*** 363 Pa.Super. 534, 526 A.2d 1192, 1199 (1987), *appeal denied,* 517

Pa. 607, 536 A.2d 1331 (1987) (holding the at-will employment presumption will be overcome if the employee shows with clarity and specificity that the parties contracted for a definite period); *see also* **Marsh v. Boyle**, 366 Pa.Super. 1, 530 A.2d 491, 493 (1987) (reasoning "parties' intentions regarding the agreement, gleaned from the surrounding circumstances, may enable an agreement to 'rise to the requisite level of clarity'") (citation omitted). "To ascertain the parties' intent, an important factor to consider is the presence of additional consideration." **Id.**

**Janis v. AMP, Inc.**, 856 A.2d 140, 144–45 (Pa.Super. 2004) (emphasis added).

The issue of determining the intent of the contracting parties is generally a jury question.[8] **Scullion v. EMECO Indus., Inc.**, 580 A.2d 1356, 1358 (Pa.Super. 1990).

The existence of a contract, the terms thereof, and the sufficiency of those terms to rebut the at-will presumption were within the province of the jury in the first instance, their finding reviewable by the trial court thereafter. In interpreting a contract to ascertain the intention of the parties the court may consider the totality of the surrounding circumstances, the situation of the parties, the objects they apparently had in mind, and the nature and subject matter of the agreement.

_____

[8] However, we recognize that:

before a case should proceed to trial, the employee must first present averments which would raise a legally sufficient factual dispute. Recent decisions have held it proper in similar instances for *the court* to examine the factual averments and decide that the surrounding circumstances and additional consideration do not sufficiently manifest an intent to overcome the at-will presumption.

**Rapagnani**, 736 A.2d at 671 (citing **Scott,** 545 A.2d at 340). As noted above, a prior panel of this Court decided in **Babb II** that the trial court erred in granting Geisinger summary judgment on his breach of contract claim that a genuine issue of material fact existed as to whether *inter alia*, Dr. Babb was an at-will employee. **Babb II**, 981 MDA 2014, at *11, 18.

***Robertson v. Atl. Richfield Petroleum Prod. Co. a Div. of Atl. Richfield Co.***, 537 A.2d 814, 819 (Pa.Super. 1987) (citation omitted). This Court has held that "[a] trial court must allow an issue to go to the jury unless it is so clear that reasonable minds could not possibly differ over its resolution." ***Greene***, 526 A.2d at 1202.

Geisinger emphasizes Dr. Babb's attorney conceded that he believed Dr. Babb had not provided additional consideration to rebut the presumption of at-will employment. However, this concession does not foreclose Dr. Babb from relief, as "the exchange of such consideration is only one of many potential factors which a court should consider. ***Greene***, 526 A.2d at 1200.

> In ***Darlington*** [***v. General Elec.***, 504 A.2d 306 (Pa.Super. 1986)]*,* the court also quoted our Supreme Court's holding in ***Price v. Confair****,* 366 Pa. 538, 79 A.2d 224 (1951). The court stated:
>
>> "[I]t is the intention of the parties which is the ultimate guide, and in order to ascertain that intention, the court may take into consideration the surrounding circumstances, the situation of the parties, the objects they apparently have in view, and the nature of the subject matter of the agreement."
>
> ***Id****.* at 542, 79 A.2d at 226.
>
> Under this more flexible approach, additional consideration is merely considered indicative of the parties' intent. If the parties exchanged "extra" consideration, it is logical that they expected their relationship to be more lasting than the usual employment agreement. However, it is very possible that the parties so intended but did not exchange additional consideration. The surrounding circumstances and the parties' own expressions may still provide clear evidence of that intent. If so, courts must enforce the parties' desired bargain. Otherwise, they are using an evidentiary rule, the at-will presumption, to defeat the parties'

intent. As already discussed, this is directly contrary to the doctrine of freedom of contract.

Pennsylvania courts have traditionally followed the flexible approach, recognizing that the paramount concern is the intention of the parties.

In *Lubrecht v. Laurel Stripping Company*, 387 Pa. 393, 127 A.2d 687 (1956), the Court repeated the maxim that an employment contract is presumptively terminable at will. The court stated that this presumption may be overcome by proof of the parties' intent based on the "surrounding circumstances." *Id*. at 396, 127 A.2d at 690. The Court made no mention of additional consideration.

*Greene*, 526 A.2d at 1200–1201.

Thereafter, this Court clarified these principles further:

*Greene* merely reaffirmed Pennsylvania's long-standing acceptance of the principle that the at-will presumption may be overcome by evidence of an implied in-fact contract. This theory of recovery was given a thorough exposition in *Darlington v. General Electric*, *supra*. There need not be additional consideration present to enforce a valid implied in-fact contract. *Id*. *See also Veno v. Meredith*, [515 A.2d 571 (Pa.Super. 1986)]. Like additional consideration, the implied in-fact theory of recovery is an intention-discerning mechanism. A court will examine numerous factors surrounding the hiring to determine whether a reasonable person in the employee's situation would understand that his employment status is at-will.

*Scott*, 545 A.2d at 340.

In this case, in holding that Geisinger was not entitled to JNOV on this

basis of the issue of at-will employment, the trial court concluded:

Whether [Dr. Babb] is at-will employee was an issue at trial and the Jury heard substantial evidence regarding [Dr. Babb's] employment, the negotiations leading up to his employment, and his treatment during his employment. [Dr. Babb] presented evidence that his employment was renewed on a two-year basis, he was provided specific wages during those periods, and he had a contract in the form of his Employment Agreement combined

with additional documents provided by [Geisinger]. There was sufficient evidence to find [Dr. Babb] had rebutted the at-will presumption.

T.C.O., 6/29/18, at 3-4.

Geisinger asserts Dr. Babb failed to rebut the presumption of at-will employment, as the parties' contract did not reflect an "agreement for a definite duration." **Rapagnani**, **supra**. While Geisinger acknowledges the contract indicates that Dr. Babb's *salary* was guaranteed for two years, Geisinger asserts there was no evidence that the employment agreement guaranteed his employment for two years.

We recognize this Court has held that "[s]alary computed per a specific time period, such as annually, does not evidence an intent that the contract is for that period." **Booth v. McDonnel Truck Servs., Inc.**, 585 A.2d 24, 27 (Pa.Super. 1991). However, in this case, it was reasonable for the jury to infer the parties intended that Dr. Babb's contract of employment to be for two years given that Dr. Babb presented evidence that 1) his initial salary upon his hiring in 1995 was guaranteed for a two-year term and 2) members of Geisinger's administration recommended that Dr. Babb be "reappointed to the professional clinic staff of Geisinger" for a new two-year term running from July 1, 1997 to June 30, 1999.

Dr. Babb's expert witness, Atty. Artz, opined that these documents, when read together, suggested the parties agreed to a two-year renewal of Dr. Babb's contract. N.T. 3/7/18, at 61-63, 77-78. Thus, it was reasonable

- 28 -

for the jury to infer that the parties agreed that Dr. Babb's employment had a definite duration of a renewable two-year term.

In addition, in order to accept employment at Geisinger, Dr. Babb was required to sign the Practice Agreement, which states that **"[p]rior to any termination** initiated by Geisinger for or without cause, however, [Dr. Babb] **shall be afforded an opportunity for a review of the underlying circumstances therefore**, pursuant to Geisinger's published guidelines governing such reviews, as amended an in effect from time to time." Practice Agreement, at 1 (emphasis added). As noted above, Geisinger acknowledges that the Practice Agreement was part of the Dr. Babb's employment contract.

This Court has held that "the clearest manner in which a party can overcome the at-will doctrine is where the employer and the employee have entered into a contract which expresses or implies a definite term of employment and forbids discharge in the absence of just cause "or **without first utilizing an internal dispute resolution mechanism**." **Rutherfoord v. Presbyterian–University Hospital**, *612* A.2d 500, 503 (Pa.Super. 1992) (emphasis added). **See also Carlson v. Arnot-Ogden Memorial Hosp.**, 918 F.2d 411, 414 (3d Cir. 1990) (finding a notice provision to be "antithetical to the very definition of employment at-will").

We also note that Dr. Babb testified that he would not have accepted Geisinger's offer for employment if Geisinger could terminate him without providing any review process, given that he was signing a restrictive covenant. N.T. 3/5/18, at 125-27, 175-176. We reiterate that the jury was permitted to

evaluate and find credible numerous factors surrounding Dr. Babb's hiring to determine whether a reasonable person in Dr. Babb's situation would understand that his employment status is at-will. **Scott**, 545 A.2d at 340.

Based on the surrounding circumstances in which the parties renewed Dr. Babb's employment for a new two-year term and agreed to abide by the Practice Agreement which provided that a physician was entitled to a review before termination procedures were initiated, it was reasonable for the jury to infer that parties intended that Dr. Babb's employment was not at-will.[9]

### Denial of JNOV – Breach of contract claim

Geisinger also argues that the trial court erred when if found sufficient evidence to establish Dr. Babb's breach of contract claim. "A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." **Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pennsylvania**, 895 A.2d 595, 600 (Pa.Super. 2006).

Geisinger attacks the jury's verdict for Dr. Babb on his breach of contract claim on several grounds: 1) whether a breach occurred, 2) whether the breach was material, and 3) whether damages resulted from the breach. First,

---

[9] Geisinger bases its entire argument challenging the jury's determination that Dr. Babb was an at-will employee on its claim that the contract did not show an agreement for a definite duration. On appeal, Geisinger does not refer to the language in the Practice Agreement suggesting Geisinger could initiate termination "for or without cause." Without advocacy on this point, there is no basis to conclude that this part of the parties' contract required the jury to find that the parties intended that Dr. Babb's employment to be at-will.

Geisinger claims it did not breach the parties' contract as both Dr. Oliver as lead physician and members of Geisinger's administration notified Dr. Babb of his charting issues. While Geisinger concedes Dr. Babb was entitled to notice and an opportunity to be heard prior to termination, Geisinger asserts the contract "did not specify or require a specific type of notice, specific number of notices, or a specific means of response." Geisinger's Brief, at 76-77.

In determining whether Geisinger breached the contract in denying Dr. Babb an appropriate opportunity to review the underlying grievances against him prior to termination, we first look to the language of the parties' contract.

> The goal of contractual interpretation is to ascertain the intent of parties at the time they entered the disputed agreement and to give effect to the agreement's terms. **Greene v. Oliver Realty, Inc.,** 363 Pa.Super. 534, 526 A.2d 1192, 1194 (1987). We will find the parties' agreement enforceable as a contract "when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." **Weavertown Transport Leasing, Inc. v. Moran**, 834 A.2d 1169, 1172 (Pa.Super.2003). An agreement is expressed with sufficient clarity "if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy." **See Greene**, 526 A.2d at 1194. Accordingly, "not every term of a contract must always be stated in complete detail[.]" **Snaith v. Snaith**, 282 Pa.Super. 450, 422 A.2d 1379, 1382 (1980). If the parties have agreed on the essential terms, the contract is enforceable even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms. **See Yellow Run Coal Co. v. Alma–Elly–Yv Mines, Ltd.,** 285 Pa.Super. 84, 426 A.2d 1152, 1155 (1981). In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it. **See Greene**, 526 A.2d at 1194. Indeed, terms of an agreement that appear otherwise vague may be rendered definite by subsequent

performance: "One or both parties may perform in such a way as to make definite that which was previously unclear." ***Greene****,* 526 A.2d at 1194.

***Helpin v. Trustees of Univ. of Pennsylvania***, 969 A.2d 601, 610–11 (Pa.Super. 2009), ***aff'd***, 608 Pa. 45, 10 A.3d 267 (2010).

Geisinger stated with sufficient clarity in its contract that it was required to give Dr. Babb notice and an opportunity to be heard with respect to the circumstances underlying his termination before Geisinger initiated termination procedures. ***See*** Practice Agreement, at 1 ("[***p***]***rior to any termination initiated by Geisinger*** for or without cause, however, [Dr. Babb] shall be afforded an opportunity for a review of the underlying circumstances therefore") (emphasis added).

Moreover, Geisinger's Involuntary Termination Review policy recognized the need for pre-termination review given the burden of Dr. Babb's restrictive covenant and the potential loss of his privileges at other hospitals.

> Geisinger provides a process for reviewing involuntary termination of a physician for two reasons: first, newly appointed or re-employed physicians are required to execute a practice agreement that restricts a physician's ability to practice in a geographic region upon termination of employment for a specified time period; and second, in some cases medical staff privileges at a Geisinger hospital may be affected by the involuntary termination."

Geisinger's Involuntary Termination Review policy, at 1 (Plaintiff's Exhibit 23). The policy sets forth the steps a physician must take to exercise their "entitlement to a hearing or review under these guidelines … [before] the termination is final." ***Id***.

- 32 -

Likewise, these documents, which formed an integral part of the contractual relationship between Geisinger and physicians, support an inference that the parties intended that Geisinger physicians receive meaningful pre-termination notice and opportunity to be heard in order to protect them from arbitrary disciplinary action. While these documents do not clearly express the extent of the notice required before Geisinger initiated termination proceedings, it was reasonable for the jury to infer that this contract required, *at a minimum*, a member of Geisinger's administration to meet with Dr. Babb informally, prior to initiating termination procedures, to give him the facts underlying the proposed termination (e.g. the the alleged deficiencies in his charting responsibilities), and a reasonable opportunity to explain and support his overall performance with documentation.

As Geisinger's termination would clearly deprive Dr. Babb of his means of livelihood, it is crucial that Dr. Babb be given an opportunity to challenge the termination with his side of the factual dispute, in order to protect him from an erroneous employment action. On a similar note, the Supreme Court of the United States found a discharged public employee was entitled to "some form of a [pre-termination] hearing" even when post-termination proceedings were available. ***Cleveland Board of Education v. Loudermill***, 470 U.S. 532, 542, 105 S.Ct. 1487 (1985) (noting the opportunity to be heard prior to termination "need not be elaborate"). Recognizing "the severity of depriving a person of the means of livelihood," the High Court found obvious value in allowing an employee opportunity to the appropriateness and necessity for his

discharge as the "only meaningful opportunity to invoke the discretion of the decisionmaker is likely to be before the termination takes effect." *Id.* (describing "the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest") (emphasis in original, citations omitted).

The notion that physicians' privileges should not be adversely affected without notice and opportunity to be heard is consistent with the provisions of the HCQIA, which was enacted to "facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits. The statute attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action." ***Freilich v. Upper Chesapeake Health, Inc.***, 313 F.3d 205, 212 (4th Cir. 2002) (quoting ***Bryan v. James E. Holmes Regional Med. Ctr.,*** 33 F.3d 1318, 1322 (11th Cir.1994)).

While immunity is offered to health care entities who comply with the provisions of the HCQIA in conducting professional review actions, the action must only be taken, *inter alia*, "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to physician under the circumstances." 42 U.S.C.A. § 11112(a)(3). The HCQIA states that a health care entity is deemed to have met the adequate notice and hearing requirement if the physician has been given notice of a *proposed* professional review action against the physician, the reasons for the action, and the subsequent hearing procedure." 42 U.S.C.A. § 11112(b)(1).

Thus, it was reasonable for the jury infer that Dr. Babb was entitled to adequate pre-termination notice and an opportunity to be heard.

There was ample evidence to show Geisinger breached this obligation. Dr. Babb was never given any notice from Geisinger that his position was in any way in jeopardy until he was terminated on May 16, 1997. In fact, before they had discussed termination with Dr. Babb, Geisinger's administration sent a staff memorandum indicating that Dr. Babb was no longer associated with Geisinger. When Geisinger's administration met with Dr. Babb, they gave him an ultimatum of resigning or being terminated without outlining the reason for his termination and refused to delay the termination.

When Dr. Babb refused to resign, Dr. Maxin and Dr. Wolfe threatened to find a reason to fire him in his charts. The next day, Dr. Wolfe notified Centre Community Hospital (CCH) that Dr. Babb was no longer covered by its professional liability policy, which led CCH to suspend Dr. Babb's privileges. Three days after leaving the hospital, Dr. Babb was notified that he was no longer employed by Geisinger, but could seek post-termination review.

Dr. Babb's expert criticized Geisinger's administration for investigating complaints against Dr. Babb by holding secretive meetings behind closed doors without Dr. Babb's participation instead of evaluating Dr. Babb's performance in peer review proceedings. He also criticized their method of reviewing Dr. Babb's charts in allowing his accusers to handpick charts from his office without his permission instead of following its policy of conducting yearly reviews of random selections of charts from all of its physicians.

Dr. Babb's claims were actually corroborated by members of Geisinger's administration, namely Dr. Maxin and Dr. Wolfe, who conceded that Dr. Babb was never given any information that would lead him to conclude that his job would be in jeopardy if he did not follow Dr. Oliver's instructions as clinical leader. N.T. 3/6/18, at 199-203, 3/7/18, at 92. Dr. Maxin indicated that no alternative disciplinary measures were considered other than termination. When asked if this lack of notice was fair to Dr. Babb, Dr. Wolfe stated, "we often don't get to choose what's fair in life." N.T. 3/7/18, at 98.[10] As a result, there was sufficient evidence to support the jury's finding that Geisinger had breached Dr. Babb's contract in failing to give him notice and an opportunity to be heard before his termination was initiated.

Geisinger also argues that even if this Court found it had breached the contract, any breach would not be material. Geisinger does not support this claim with any valid analysis but asserts that the trial court should have found in its favor because Geisinger "addressed any defects through its post-termination Fair Hearing." Geisinger's Brief, at 82. Geisinger fails to

_____

[10] We do not agree with Geisinger's assertion that its satisfied its own requirement to give Dr. Babb adequate notice and opportunity of his proposed termination by informally meeting with him to discuss his need to improve his charting responsibilities. Dr. Wolfe and Myers communicated with Dr. Babb on October 21, 1996, nearly seven months before his termination, to ask Dr. Babb to improve his chart documentation. From that date to May 1, 1997, Geisinger's administration did not communicate with Dr. Babb in any way concerning his performance issues. On May 1, 1997, Dr. Wolfe identified Dr. Babb's charting issues, but despite these deficiencies, recommended Dr. Babb for reappointment to Geisinger's staff and merely told Dr. Babb to "try to keep up" with his charting responsibilities. N.T. 3/5/19, at 152.

acknowledge that the trial court excluded all evidence related to the post-termination Fair Hearing *at Geisinger's* request. Thus, the jury was never presented with any evidence related to the post-termination Fair Hearing. "When reviewing a trial court's denial of a motion for JNOV, we must consider all of **the evidence admitted** to decide if there was sufficient competent evidence to sustain the verdict." **V-Tech Servs., Inc. v. St.**, 72 A.3d 270, 275 (Pa.Super. 2013) (emphasis added). Geisinger does not offer any analysis to suggest why the trial court should have considered evidence that Geisinger successfully excluded from the jury's consideration. Thus, we decline to review this claim further.

Geisinger next claims that Dr. Babb failed to show that any damages resulted from its breach of contract and that the jury's damages were speculative. Our Supreme Court has discussed the damages prong of the breach of contract analysis as follows:

> [w]here one party to a contract, without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he [or she] suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

> **Ferrer v. Trustees of the Univ. of Pennsylvania**, 573 Pa. 310, 825 A.2d 591, 610 (2002) (internal quotation marks and citation omitted). "A damage award should place the non-breaching party as nearly as possible in the same position [it] would have occupied had there been no breach." [**Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.**, 181 A.3d 1188, 1194 (Pa. Super. 2018)] (internal quotation marks and citations omitted).

- 37 -

*Davis v. Borough of Montrose*, 194 A.3d 597, 611–12 (Pa.Super. 2018).

Geisinger suggests that its breach of contract, in denying Dr. Babb notice and an opportunity to be heard, did not cause Dr. Babb any damages. Rather, Geisinger asserts that Dr. Babb's termination caused the damages and faults Dr. Babb for not filing a wrongful termination claim. Geisinger suggests that even if Dr. Babb had been given notice and opportunity to be heard, Geisinger would have had justification to terminate him and the damages would have resulted from the termination.

However, Geisinger fails to recognize that Dr. Babb presented evidence for the jury to conclude that, had he been given proper pre-termination notice and opportunity to be heard, that he could have avoided termination and the damages the followed. Although Geisinger alleged that Dr. Babb was severely delinquent in his recordkeeping on patient charts, Dr. Babb questioned the validity of Geisinger's grounds for terminating him by presenting his evaluation results from the Geisinger's Ambulatory Medical Record Review, which objectively reviewed a random sampling of medical reports of each physician. Dr. Babb's mean performance score in 1996 of 89.58% was clearly satisfactory considering that Geisinger's Quality Improvement Committee set a threshold of 70% compliance for each doctor.

In contrast to this objective evidence, Dr. Babb criticized Geisinger's method of evaluating his charting responsibilities to justify his termination, which was exclusively based on reports that Dr. Oliver removed from Dr. Babb's office without his permission. Geisinger's administrators admitted that

they decided to fire Dr. Babb based on reports handpicked by his accusers without telling Dr. Babb that his position was in jeopardy or giving him any opportunity to convince them that his termination was not warranted.

In addition, we reject Geisinger's claim that even if it failed to give Dr. Babb proper notice and opportunity to respond to the circumstances underlying his termination, Geisinger remedied this breach by conducting post-termination proceedings that revealed adequate grounds to support Dr. Babb's termination. Again, we reiterate that Geisinger convinced the trial court to exclude all evidence related to the post-termination hearings. As this evidence was not presented to the jury, we cannot consider it on appeal.[11]

Dr. Babb testified extensively that the absence of notice and an opportunity to be heard prevented him from challenging his termination, leading to devastating effects on his ability to find equivalent employment opportunities, as he was required to report his termination in seeking future employment with other health care entities. Thus, the jury had a basis to

_____

[11] Moreover, even if this evidence were considered, it does not strongly prove that post-termination hearings would have prevented harm that resulted from Geisinger's breach. It seems unlikely that Dr. Babb could have convinced Geisinger's administration to reverse his termination in post-termination review proceedings after Geisinger took affirmative steps to separate Dr. Babb from the clinic before and immediately after his termination.

conclude that the damages sustained by Dr. Babb resulted from Geisinger's failure to give him notice and opportunity to be heard.[12]

We also reject Geisinger's claim that Dr. Babb failed to prove his damages with reasonable certainty.

> [D]amages in a breach of contract action must be proved with reasonable certainty. Otherwise, they are generally not recoverable. As a general rule, damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. The question of whether damages are speculative has nothing to do with the difficulty in calculating the amount by deals with the more basic question of whether there are identifiable damages.

***Printed Image of York, Inc. v. Mifflin Press, Ltd.***, 133 A.3d 55, 59–60 (Pa.Super. 2016).

Dr. Babb presented evidence that he suffered extensive damages as a result of Geisinger's breach, specifically, his loss of yearly $210,000 salary, his inability to secure comparable full-time employment for 20 years, and the loss of Geisinger's employment benefits, including his performance incentive, the payment of his continuing education and licensing requirements (valued

---

[12] We note that Geisinger makes no attempt to challenge the trial court's finding that Dr. Babb proved that his damages were "reasonably foreseeable and within the contemplation of the parties at the time they made the contract." ***Davis***, ***supra***. As a result, we need not review this issue on appeal.

However, we note that Dr. Maxin, a key decision-maker in Dr. Babb's termination, admitted that it was "pretty clear" that Dr. Babb's termination would have lasting implications. N.T. 3/8/18, at 48. Despite this knowledge of the significant implications of a termination, Geisinger's administration denied Dr. Babb notice and opportunity to be heard before terminating him.

at $3,500 annually), malpractice insurance (ranging from $28,000 - $60,000 annually), and the payment of the $19,000 balance of the forgivable loan.

Geisinger suggests that the jury did not consider whether Dr. Babb mitigated his losses in seeking other employment opportunities after his termination.

> It is well established that one who suffers a loss due to breach of contract has a duty to make reasonable effort to mitigate her damages. *Bafile v. Borough of Muncy,* 527 Pa. 25, 588 A.2d 462 (1991). In an employment case, the measure of damages is the wages which were to be paid less any amount actually earned or which might have been earned through the exercise of reasonable diligence in seeking other similar employment. *Appeal of Edge,* 147 Pa. Commw. 27, 606 A.2d 1243 (1992). The burden is on the breaching party to show that the losses could have been avoided. *Id.* This burden can be established "by proving that other substantially equivalent positions were available to [Appellant] and that [she] failed to use reasonable diligence in attempting to secure those positions." *Id.* at 34, 606 A.2d at 1247.

*Delliponti*, 545 Pa. at 443, 681 A.2d at 1265.

Despite this claim, Geisinger's counsel never argued at trial that Dr. Babb failed to use reasonable diligence in seeking to find similar employment. On the contrary, Dr. Babb presented evidence that he used reasonable diligence in seeking equivalent employment, but was unsuccessful in doing so. Following his termination, Dr. Babb honored his non-compete agreement to refrain from practicing medicine within a 15-mile radius of the clinic. Dr. Babb indicated that it was difficult to find equivalent employment as each time he applied for a new position, as he was required to list his prior employment with Geisinger and explain why he was terminated. Dr. Babb admittedly was

- 41 -

employed by Clearfield Hospital from 1997-2004, but was forced to resign from that position as the cost of malpractice insurance was cost-prohibitive.

Thereafter, Dr. Babb was unable to obtain full-time employment anywhere in the United States, but was only able to obtain temporary *locum tenens* jobs in other states such as New York, North Dakota, South Dakota, and Montana, while his wife stayed at the marital home with their daughter in Centre County, Pennsylvania. Dr. Babb indicated that he could only find full-time work in Sitka, Alaska, where he is currently employed. Kimberly Babb testified to the couple's financial troubles and confirmed that the couple had negative income several years after Dr. Babb's termination.

Viewing the evidence in the light most favorable to Dr. Babb and giving him the benefit of all reasonable inferences, we cannot find that the trial court abused its discretion or committed an error of law in denying Geisinger's motion for JNOV. Even assuming we were to disagree with the jury's verdict, we may not grant a motion for JNOV simply because we would have come to a different conclusion. ***Menkowitz***, ***supra***. Geisinger has not shown that the law requires a verdict in its favor or that "the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered" in its favor. ***Id***.

### Challenge to the trial court's discretion in instructing the jury

In its fourth and fifth claims, Geisinger claims that the trial court erred when it failed to provide several of its requested jury instructions.

- 42 -

I]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this [C]ourt to determine whether the record supports the trial court's decision." *Lockhart v. List,* 542 Pa. 141, 147, 665 A.2d 1176, 1179 (1995). In examining the propriety of the instructions a trial court presents to a jury, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. *Boutte v. Seitchik,* 719 A.2d 319, 324–325 (Pa.Super. 1998). A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. *Potochnick v. Perry,* 861 A.2d 277, 283 (Pa.Super. 2004). A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. *Atwell v. Beckwith Machinery Co.,* 872 A.2d 1216, 1222 (Pa.Super. 2005); *Angelo v. Diamontoni,* 871 A.2d 1276, 1279 (Pa.Super. 2005).

*Commonwealth v. Thomas,* 904 A.2d 964, 970 (Pa.Super. 2006). We emphasize "[t]he trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the Appellant was prejudiced by that refusal." *Id*.

### *Requested instruction on the presumption of at-will employment*

Geisinger specifically argues that the trial court abused its discretion in refusing to give its requested instruction indicating the employee has a burden to overcome the *presumption* of at-will employment. Geisinger also requested that the jury be informed Dr. Babb's employment could still be considered at-will even though the parties had a written contract.

In this case, the trial court quoted a standard jury instruction that indicates that "[u]nder Pennsylvania law, an employer may terminate an employee for any reason or no reason unless the plaintiff proves the

termination violated an employment agreement." N.T. 3/8/18, at 147 (quoting Pa.S.S.J.I.(Civ) 21.00). While the trial court did not use the term "presumption," it adequately informed the jury that Dr. Babb had the burden to show that his contract restricted Geisinger from terminating him "for any reason or no reason at all." This Court has held a trial court "may properly refuse a requested instruction when the substance of that request has already been given in either a general or specific charge." ***Butler v. Kiwi, S.A.***, 604 A.2d 270, 273 (Pa.Super. 1992).

Moreover, the concept of at-will employment was explained in detail by the parties throughout their opening and closing arguments. The trial court noted that it felt that Geisinger's requested instruction would confuse and distract the jury. Geisinger has not demonstrated that the jury instruction as a whole in this case was inadequate, not clear, misleading or confusing and has not shown that it was prejudiced by the trial court's refusal to give this additional instruction. As such, we cannot find the trial court abused its discretion in denying the request for this instruction.

### Requested instruction on prohibiting speculative damages

Geisinger also argues that the trial court abused its discretion in denying its requested instruction to inform the jury that they were not permitted to speculate in calculating damages. In this case, the trial court directly quoted the standard jury instruction on damages:

> I am instructing you about damages, but that does not mean I
> have an opinion about whether damages should be awarded. If
> you find that Geisinger Clinic breached the contract, you should

- 44 -

award an amount of money that will fairly and adequately compensate Dr. Babb for the harm caused by the breach. The amount you award today must compensate Dr. Babb completely for damages sustained in the past, as well as damages he will sustain in the future.

Dr. Babb claims the following types of damages: Direct and consequential damages. Generally, damages include the amount of money that will put Dr. Babb in the position that he would have been in if Geisinger had not breached his contract. It includes not only damages that directly result from the breach, but also those damages that were foreseeable at the time the parties entered into their contract.

N.T. 3/8/18, at 148-49 (quoting Pa.S.S.J.I.(Civ) 19.250). Geisinger has no objection to the trial court's subsequent instructions with respect to reliance damages, nominal damages, and Dr. Babb's duty to mitigate damages.

Geisinger claims the trial court erred in refusing to instruct the jury that they "must prove [] damages with reasonable certainty" and that "damages are not recoverable if they are too speculative, vague, or contingent, and they are not recoverable for loss beyond an amount that the evidence permits to be established within reasonable certainty." N.T. 3/8/18, at 85.

While Geisinger's requested instruction accurately states the applicable law, we cannot find the trial court's refusal to give this instruction warrants reversal. At trial, Dr. Babb provided ample evidence of the harm caused by Geisinger's breach by clearly outlining each of his claimed damages as well as providing twenty years' of his income tax returns, which he jointly filed with his wife. This evidentiary record left little room for the jury to speculate about Dr. Babb's damages. As such, we cannot find that the jury's refusal to give Geisinger's requested instruction resulted in prejudicial error. ***See also***

*Commonwealth v. Humpheys*, 532 A.2d 836, 840 (Pa.Super. 1987) (finding the trial court's failure to define an element to the jury was not prejudicial error); *Commonwealth v. Ehrsam*, 512 A.2d 1199, 1209 (Pa.Super. 1986) (finding harmless error in the trial court's incorrect instruction that victim had a duty to retreat as the evidence established that the victim could not have safely retreated).

### Claims Based on Collateral Estoppel Principles

Sixth, Geisinger claims the trial court erred when it denied Geisinger's motion *in limine* and requested jury instructions pertaining to collateral estoppel and law of the case. We are guided by the following principles:

> It is well-settled that the doctrine of collateral estoppel precludes relitigation of an issue settled in a previous action if:
>
>> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.
>
> *Office of Disciplinary Counsel v. Kiesewetter*, 585 Pa. 477, 889 A.2d 47, 50–51 (2005). "Collateral estoppel relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication." *Id.* at 51.

*Skotnicki v. Ins. Dep't*, 644 Pa. 215, 229, 175 A.3d 239, 247 (2017).

However, while Geisinger lists issues of fact that it argues were previously determined in previous opinions, it fails to offer any citation of the

particular court opinion that it suggests made a final adjudication on the merits of such issues and fails to analyze its claim with collateral estoppel principles. As such, we find Geisinger's arguments based on collateral estoppel to be waived for lack of development. ***Commonwealth v. Baumhammers***, 625 Pa. 354, 413, 92 A.3d 708, 744 (2014) (deeming appellant's issue to be waived when it was not supported with developed advocacy).

## **Challenge to the Expert Testimony of Atty. Artz**

Seventh, Geisinger claims the trial court erred when it qualified Atty. Artz as an expert witness and failed to preclude testimony that went beyond the scope of his report. We are guided by the following principles:

> In Pennsylvania, the standard for qualification of an expert witness is a liberal one. ***Miller v. Brass Rail Tavern***, 541 Pa. 474, 664 A.2d 525, 528 (1995). The test to be applied when qualifying a witness "is whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation." ***Id.*** (emphasis added). The witness need not possess "all of the knowledge in a given field" but must only "possess more knowledge than is otherwise within the ordinary range of training, knowledge, intelligence or experience. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine in view of the expert's particular credentials." ***Id.***

***Wright v. Residence Inn by Marriott, Inc.***, 207 A.3d 970, 976 (Pa.Super. 2019).

> The admission of expert testimony is a matter of discretion for the trial court, and will not be disturbed absent an abuse of discretion. *Commonwealth v. Walker,* 625 Pa. 450, 92 A.3d 766, 772 (2014). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence

or the record, discretion is abused." *Id.* at 772–73 (citation omitted).

Expert testimony is admissible in all cases, civil and criminal alike, "when it involves explanations and inferences not within the range of ordinary training knowledge, intelligence and experience." *Id.* at 788 (quoting *Commonwealth v. Leslie,* 424 Pa. 331, 227 A.2d 900, 903 (1967)). Even where an expert's testimony arguably went beyond the scope of his or her report, the defendant still bears the burden of proving he suffered prejudice from the admission of the testimony. *See Commonwealth v. Henry,* 550 Pa. 346, 706 A.2d 313, 326–327 (1997). The trial court has broad discretion in choosing the appropriate remedy for a discovery violation. *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 512 (1995).

**Commonwealth v. Poplawski**, 634 Pa. 517, 130 A.3d 697, 718 (2015).

Geisinger argues that the trial court erred in qualifying Atty. Artz as an expert witness as he previously served as Dr. Babb's counsel in this case in 2002 and thus, could not offer frank and objective testimony as owed a duty of zealous advocacy to his client. However, this argument challenges the weight of Atty. Artz's testimony, not its admissibility. Geisinger's counsel was free to impeach Atty. Artz's credibility with these allegations of his bias. It was the province of the jury as factfinder to make credibility determinations based on the witness's testimony. As such, the trial court did not err in allowing Atty. Artz to offer expert testimony.

To the extent that Geisinger claims that Atty. Artz offered testimony beyond the scope of his expert report, we observe that Geisinger failed to preserve this challenge for appeal by specifically objecting to the impermissible testimony to give the trial court an opportunity to preclude this evidence. "[i]ssues not raised in the lower court are waived and cannot be

raised for the first time on appeal." Pa.R.A.P. 302(a). "[T]o preserve a claim of error for appellate review, a party must make a specific objection to the alleged error before the trial court in a timely fashion and at the appropriate stage of the proceedings; failure to raise such objection results in waiver of the underlying issue on appeal." **Commonwealth v. Akbar**, 91 A.3d 227, 235 (Pa.Super.2014) (citation omitted). With respect to evidentiary challenges, "[a] party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made. If counsel states the grounds for an objection, then all other unspecified grounds are waived and cannot be raised for the first time on appeal." **Commonwealth v. Bedford**, 50 A.3d 707, 713 (Pa.Super. 2012) (*en banc*) (citations omitted).

At the beginning of Atty. Artz's testimony, Geisinger's counsel objected to a specific line of questioning, which it asserted was outside the bounds of Atty. Artz's expert report. In response, Dr. Babb's counsel withdrew the line of questioning. Thereafter, Geisinger's counsel did not make a specific objection to testimony it challenges on appeal. As such, the trial court never had the opportunity at trial to make a contemporaneous ruling on whether such testimony was properly within Atty. Artz's expert report. Accordingly, Geisinger's challenge to the substance of Atty. Artz's testimony is waived.

### Denial of Geisinger's Motion for Remittitur

Lastly, Geisinger claims that the trial court erred in denying its motion for remittitur of the jury's $5.5 million verdict.

The assessment of damages is peculiarly within the province of the factfinder and an award will not be upset on appeal unless it is so excessive as to shock the conscience of the court or it is clearly based on partiality, prejudice or passion. *De Simone v. City of Philadelphia*, 380 Pa. 137, 110 A.2d 431 (1955). Generally, under Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences. *See, e.g.*, *Morin v. Brassington*, 871 A.2d 844, 852 (Pa. Super. 2005), *quoting J.W.S. Delavau Inc. v. Eastern America Transp. & Warehousing, Inc.*, 810 A.2d 672, 685 (Pa. Super. 2002); *James Corp. v. N. Allegheny Sch. Dist.* 938 A.2d 474, 494 (Pa. Cmwlth. 2007); *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324, 327 (3d Cir. 1980). Where the amount of damages can be fairly estimated from the evidence, the recovery will be sustained even though such amount cannot be determined with entire accuracy. *Mass. Bonding & Ins. Co. v. Johnston & Harder*, 343 Pa. 270, 22 A.2d 709, 713–14 (1941). We review a trial court's decision whether to grant a new trial based on alleged excessiveness or inadequacy of the verdict for an abuse of discretion. *Botek v. Mine Safety Appliance Corp.*, 531 Pa. 160, 611 A.2d 1174, 1176 (1992). Judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. *Haines v. Raven Arms*, 536 Pa. 452, 640 A.2d 367, 369 (1994). The refusal of a remittitur is peculiarly within the discretion of the trial court and will not be reversed absent an abuse of discretion or error of law. *Id.*, *citing Scaife Co. v. Rockwell–Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 456–57 (1971).

**Bailets v. Pennsylvania Tpk. Comm'n**, 645 Pa. 520, 540, 181 A.3d 324, 336 (2018).

In this case, we cannot find the jury verdict was so excessive as to shock the conscience or that it was clearly based on partiality, prejudice, or passion. The jury's calculation of the damages that Dr. Babb sustained as a result of Geisinger's breach was supported by evidence presented at trial. Specifically, Dr. Babb's annual base salary of $210,000 per year multiplied by the twenty years is $4.2 million. Dr. Babb also presented evidence that the breach of

contract deprived him of various benefits, such as the payment of his yearly malpractice insurance and his yearly allowance for continuing education and certification requirements. As a result, we conclude that the trial court did not abuse its discretion in denying Geisinger's motion for remittitur.

## Cross-appeal – Denial of Prejudgment Interest

Turning to the cross-appeal, Dr. Babb argues that he should have been awarded prejudgment interest. Prejudgment interest may be awarded under certain limited circumstances:

> Even where a party's right to the payment of interest is not specifically addressed by the terms of a contract, a nonbreaching party to a contract may recover, *as damages,* interest on the amount due under the contract; again, this Court refers to such interest as prejudgment interest. The purpose of awarding interest as damages:
>
>> is to compensate an aggrieved party for detention of money rightfully due him or her, and to afford him or her full indemnification or compensation for the wrongful interference with his or her property rights. The allowance of interest as an element of damages is not punitive, but is based on the general assumption that retention of the money benefits the debtor and injures the creditor.
>
> 25 C.J.S. Damages, § 80.
>
> ***
>
> With regard to prejudgment interest, we have explained, "[i]nterest has been defined 'to be a compensation allowed to the creditor for delay of payment by the debtor,' and is said to be impliedly due 'whenever a liquidated sum of money is unjustly withheld.'" *School Dist. of City of Carbondale v. Fidelity & Deposit Co. of Maryland,* 346 Pa. 491, 492, 31 A.2d 279, 280 (1943) (citations omitted). However, "as prerequisites to running of prejudgment interest, the debt must have been liquidated with some degree of certainty and the duty to pay it must have become fixed." *Id.* at 493, 31 A.2d at 280; Restatement (Second) of

Contracts § 354(1) ("If the breach consists of a failure to pay a definite sum of money or to render a performance with fixed or ascertainable monetary value, interest is recoverable."). Thus, even where the terms of a contract do not expressly provide for the payment of interest, a nonbreaching party has a legal right to recover interest, as damages, on a definite sum owed under the contract.

*TruServ Corp. v. Morgan's Tool & Supply Co.*, 614 Pa. 549, 566–68, 39 A.3d 253, 263–64 (2012).

This Court has further explained that:

> prejudgment interest is a matter of right where the amount is ascertainable from the contract. Where the amount due and owing is not sufficiently definite, prejudgment interest is awardable at the discretion of the trial court.

> *Ely v. Susquehanna Aquacultures, Inc.*, 130 A.3d 6, 15 (Pa. Super. 2015) (citation omitted), *appeal denied*, 635 Pa. 764, 136 A.3d 982 (2016). "Our review of an award of pre-judgment interest is for abuse of discretion." *Kaiser v. Old Republic Ins. Co.*, 741 A.2d 748, 755 (Pa. Super. 1999).

*Century Indem. Co. v. OneBeacon Ins. Co.*, 173 A.3d 784, 810 (Pa.Super. 2017)).

> Damages for breach of contract include not only the value of the promised performance but also compensation for consequential loss. The amount to be awarded for such loss is often very difficult to estimate in advance of trial and cannot be determined by the party in breach with sufficient certainty to enable him to make a proper tender. In such cases, the award of interest is left to judicial discretion, … in the light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him.

*Cresci Const. Servs., Inc. v. Martin*, 64 A.3d 254, 260–61 (Pa.Super. 2013) (quoting Restatement (Second) of Contracts § 354 cmt. d. (1981)).

Based on the foregoing principles, we agree with the trial court's finding that Dr. Babb had not shown that he had a legal right to prejudgment interest as the damages in this case were not designated as a definite sum of money. As such, prejudgment interest was awardable to the trial court's discretion.

In this case, the trial court found that Dr. Babb "was adequately compensated by the Jury verdict without interest." T.C.O., at 2. We find that the trial court did not abuse its discretion in refusing to award Dr. Babb prejudgment interest.

Based on the foregoing reasons, we affirm the judgment in this case.

Judgment affirmed. Geisinger's "Motion to Quash" is granted in part by striking improper portions of Dr. Babb's Brief. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/17/2019