776 A.2d 938

Gene W. MANZETTI, M.D. & Gene W.
Manzetti, M.D., P.C., Appellants,

v.

The MERCY HOSPITAL OF PITTSBURGH, Edward T. Wenzke,
Dr. Ronald V. Pellegrini, Dr. Ross F. DiMarco, Jr., Dr. Dennis
Manning, Dr. Howard A. Zaren, Dr. William Hetrick, Dr. Joann
V. Narduzzi, Dr. Mitchell Massie, Dr. Robert H. Boretsky, Dr.
Chester A. Phillips, III, Dr. Richard J. Kuwik, Dr. Patrick J.
Vlahos, Dr. Daniel R. Sullivan, Dr. Christopher A. Troianos, Dr.
Mark Stypula and Dr. Donna M. Lucas, Appellees.

Supreme Court of Pennsylvania.

Argued March 5, 2001.

Decided July 18, 2001.

472

474

476

Peter Matthews Wright, Pittsburgh, James Gregory Cirilano, McKees Rocks, for Gene W. Manzetti, M.D.

Eric W. Springer, Barbara Blackmond, Pittsburgh, for The Mercy Hospital of Pittsburgh, et al.

Before FLAHERTY, C.J., ZAPPALA, CAPPY, CASTILLE, SAYLOR, JJ.

## *OPINION*

CAPPY, Justice.

We granted allocatur to determine whether the trial court correctly granted partial summary judgment in the instant matter on the basis that the immunity provisions of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101 *et seq.* bar recovery of monetary damages for claims arising out of a peer review process. For the foregoing reasons, we affirm.

Dr. Gene Manzetti ("Manzetti") is a cardiac surgeon. From July of 1979 until February 11, 1994, he was privileged to perform all types of open-heart and vascular surgical procedures offered at Mercy Hospital of Pittsburgh ("Mercy").

In August of 1993, Dr. Mitchell Massie ("Massie") approached Dr. Ronald Pellegrini ("Pellegrini") with concerns about Manzetti's surgical skills. At that time, Massie was a surgical resident at Mercy while Pellegrini was the Chief of the Division of Cardiac Surgery. Massie confided to Pellegrini that he found Manzetti's surgical skills to be so poor that he had ethical and moral problems about operating with Manzetti. Massie specifically referenced the high number of complications occurring among open-heart patients who were under Manzetti's care.

In early January of 1994, Pellegrini was approached by Dr. Ross DiMarco ("DiMarco"), a cardiac surgeon, regarding a call he had received from Manzetti. Manzetti had telephoned DiMarco after one of Manzetti's patients had died and requested that DiMarco give him reassurance that he was a good surgeon. DiMarco described Manzetti as being emotionally distraught over the patient's death.

On January 15, 1994, Pellegrini orally requested that Manzetti voluntarily agree to cease performing open-heart surgeries so that no formal restrictions of Manzetti's privileges need be imposed. Manzetti did not accede to this request. Within the following two weeks, he performed two additional open-heart surgeries. The first was uneventful. The second, however, was fraught with serious intraoperative complications. Even though serious problems arose during this surgery, Manzetti noted on that patient's chart that the operative course was uncomplicated.

On February 4, 1994, Pellegrini wrote a letter to Manzetti in which he informed Manzetti that his privileges to perform open-heart surgery at Mercy were suspended effective February 14, 1994.

Manzetti immediately objected to Pellegrini's letter. On February 11, 1994, three days before the effective date of the suspension listed in Pellegrini's February 4, 1994 letter, Mercy's Medical Executive Committee ("MEC") held a meeting to consider suspending Manzetti's privileges to perform open-heart surgery. Later that same day, the MEC suspended Manzetti's cardio-thoracic surgery privileges. It also decided to conduct a further investigation of Manzetti and reconvene on February 24, 1994.

During this investigation, the MEC examined the medical records of more than a score of Manzetti's open-heart patients. It also conducted interviews with eight anesthesiologists who had worked with Manzetti during open-heart surgeries. Finally, Drs. William Hetrick ("Hetrick") and Dennis Manning ("Manning"), two members of the MEC, presented a statistical report. This report ("Hetrick and Manning statisti-

cal study") showed that Manzetti's open-heart surgery patients had a higher complication and mortality rate than open-heart surgery patients of other physicians at Mercy. Upon reconvening on February 24, 1994, the MEC voted unanimously to continue Manzetti's suspension.

Subsequently, Manzetti requested and was granted a hearing before a panel of three physicians (the "hearing panel"). Hearings were held on May 14, October 25 and October 26, 1994. The MEC presented the testimony of several cardiac surgeons. These surgeons testified as to incompetence on Manzetti's part during surgery as well as Manzetti's inability to respond appropriately to stress. Eight anesthesiologists who worked with Manzetti during his performance of open-heart surgery also testified. Each of these anesthesiologists testified that they found Manzetti's performance of this type of surgery to be subpar. In fact, each testified that if they heard that friend was going to have open-heart surgery performed on them by Manzetti, they would urge that friend to find another cardiac surgeon.

The MEC also established that for more than ten years preceding the suspension of Manzetti's open-heart surgery privileges, Manzetti performed only twenty to twenty-five open-heart surgeries a year. This volume was far lower than the one hundred open-heart surgeries that the Society of Thoracic Surgeons and other professional groups recommend a cardiac surgeon to perform each year in order to maintain a minimal level of competency. The MEC also introduced the Hetrick and Manning statistical study to show that Manzetti's open-heart patients had a higher complication and mortality rate than patients of other physicians. Finally, the MEC introduced evidence that Manzetti would fail to document complications in the charts of his patients.

Manzetti, who was represented by counsel, presented several witnesses in his defense. He introduced the expert testimony of two statisticians. The statisticians attacked the Hetrick and Manning statistical study. They asserted that Hetrick and Manning did not gather data in a fashion that a professional statistician would approve, and thus did not account for

variables that could affect the results. In addition, Manzetti presented the testimony of three other physicians and the manager of Mercy's Quality Management Department; Manzetti also testified on his own behalf.

On December 5, 1994, the hearing panel issued a recommendation in favor of the MEC. The hearing panel explicitly stated that it gave "no credence" to the Hetrick and Manning statistical study. Report and Recommendation of the Hearing Panel, dated 12/05/1994, at 13. In recommending that Manzetti's privileges be suspended, the hearing panel focused on the fact that for more than a decade, Manzetti's volume in performing open-heart surgeries had been far below the number recommended to maintain competence in performing this procedure. Furthermore, the hearing panel found it disturbing that Manzetti failed to document complications experienced by his patients. The hearing panel also concluded that the poor relationships between Manzetti and the technicians and other physicians had a deleterious effect on patient care. The hearing panel thought it particularly striking—and troubling—that each of the anesthesiologists would urge a friend to go elsewhere if that friend were contemplating having Manzetti perform open heart surgery on him. .

Manzetti appealed the hearing panel's decision to a review panel. This review panel was comprised of two physicians and one attorney. On February 15, 1995, after hearing argument, the review panel recommended that Mercy's Board of Trustees ("Board of Trustees") uphold Manzetti's suspension. The review panel also recommended that Manzetti be given a provisional open-heart surgery privilege for one year subject to various conditions; these conditions included the requirement that Manzetti at all times must be assisted by a board certified surgeon and that Manzetti bring his volume of open-heart surgery cases to the recommended level of more than one hundred per year. The review panel noted that it recommended this provisional privilege only to the extent that the medical staff would agree to it.

On March 10, 1995, the Board of Trustees issued a resolution upholding Manzetti's suspension. The Board of Trustees

rejected, however, the review panel's recommendation that Manzetti be granted provisional open-heart surgery privileges as it was not in the best interests of future patients. The Board of Trustees reasoned that the monitoring process was unlikely to bring about an improvement in Manzetti's skills as he had shown himself to be resistant to taking constructive criticism. The Board of Trustees also found it extremely unlikely that in one year, Manzetti would be able to build the volume of his open-heart surgeries to the required level as he had been unable to do so in any of the years in the preceding decade.

On February 2, 1995, prior to the issuance of the review panel's report, Manzetti and his professional corporation (collectively, "Appellants") commenced the instant action naming Mercy, the president of Mercy, and the physicians who were the members of the MEC as defendants (collectively, "Appellees"). The complaint contained ninety-nine counts, including breach of contract and defamation claims. Appellants requested both monetary and injunctive relief; all of the claims for monetary relief arose out of Appellees' participation in the peer review process.

After discovery commenced, Appellees moved for summary judgment. Appellees contended that the immunity provisions of the HCQIA precluded them from being held liable for monetary damages as all of Appellants' claims arose out of the peer review process. On November 12, 1996, the trial court granted partial summary judgment in favor of Appellees, and dismissed all of Appellants' claims for monetary damages. The parties then settled Appellants' remaining claims, all of which requested injunctive relief; the trial court thereafter issued a final order on January 16, 1998.

The Commonwealth Court on appeal agreed with the trial court that the immunity provisions of the HCQIA precluded Appellees from being held liable in money damages. *Manzetti v. Mercy Hospital of Pittsburgh*, 741 A.2d 827 (Pa.Cmwlth. 1999). It therefore affirmed the trial court. Appellants filed a petition for allowance of appeal, which this court granted. For the reasons that follow, we now affirm.

In examining an entry of summary judgment, we examine the trial court's determination for error of law or abuse of discretion. *Capek v. Devito*, 767 A.2d 1047 (Pa.2001). As with all questions of law, our review is plenary. *Phillips v. A–Best Products Co.*, 542 Pa. 124, 665 A.2d 1167 (1995).

■ In examining the trial court's determination, we focus our attention on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2.[1] That rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the nonmoving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. We have stated quite plainly that "[f]ailure of a non-moving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof ... establishes the entitlement of the moving party to judgment as a matter of law." *Young v. Com., Dept. of Transp.*, 560 Pa. 373, 375, 744 A.2d 1276, 1277 (2000). Finally, in determining whether summary judgment should enter, the record is to be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 144, 615 A.2d 303, 304 (1992).

The trial court below found that as a matter of law, the immunity provisions contained in the HCQIA precluded Appellants from recovery monetary damages from Appellees. As this court has not previously analyzed the HCQIA, a brief disquisition on it is in order.

1. Our summary judgment rule was amended while this matter was pending; the amended rule became effective before the trial court ruled on the summary judgment motion. As our rules of civil procedure state that an amended rule is applicable to all actions pending on the date on which the amendment becomes effective, it is the amended rule, rather than the rescinded rule, that is applicable to this matter. *See* Pa.R.C.P. Rule 52(c).

■■ The HCQIA was created by the United States Congress in order "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. (1986). In order to further the candor necessary to such a process, the Congress inserted immunity provisions in the HCQIA. These provisions provide that anyone participating in or aiding a professional review body shall not be held liable in monetary damages for claims arising out of the peer review process. 42 U.S.C. § 11111(a)(1). In order to qualify for this immunity, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a). The HCQIA further states that a professional review action shall be presumed to have met these four standards. The plaintiff has the burden to overcome this presumption by a preponderance of the evidence. *Id.*

■■ In an HCQIA action, plaintiffs are not permitted to introduce evidence of bad faith of the participants in the peer review process. The "reasonableness" requirements of § 11112(a) "create an objective standard, rather than a subjective good faith standard." *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992). Thus, the alleged bad faith of the participants in the peer review process is immaterial to determining whether these participants are entitled to immunity under the HCQIA. Rather, the inquiry is whether a person presented with the same information that was placed before

the peer review body " 'would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.' " *Id.* (quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10). This inquiry examines the totality of the circumstances. *Imperial v. Suburban Hosp. Assoc., Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994).

 A synthesis of our summary judgment law and the HCQIA reveals that a plaintiff bears the burden of proof in rebutting the presumption that a defendant acted in compliance with § 11112(a). Thus, the entry of summary judgment against a plaintiff will be reversed only if he can establish that there is either a genuine dispute about a material fact or that he has adduced sufficient evidence so that a jury, examining the totality of the circumstances, could conclude that the plaintiff had rebutted the presumption.[2]

In the matter *sub judice,* Appellants' primary contention is that they have created a jury question as to whether Appellees suspended Manzetti's privileges "after a reasonable effort to obtain the facts of the matter," 42 U.S.C. § 11112(a)(2). In particular, they attack the propriety of the actions taken by Dr. Pellegrini via his letter dated February 4, 1994, as well as those taken by the MEC on February 11 and 24, 1994 (collectively, the "February of 1994 actions"). Appellants allege that the investigation conducted prior to those February of 1994 actions was inadequate and was compromised by misinformation, conflicts of interest, and downright fabrications.

Appellants' argument rests on the supposition that these February of 1994 actions, when viewed in isolation, had to comply with § 11112(a). In support of this conclusion, Appellants rely on *Mathews v. Lancaster General Hospital,* 87 F.3d 624 (3d Cir.1996). Appellants contend that *Mathews* stands for

2. We note that this legal rule applies only where summary judgment is entered against a plaintiff in an HCQIA matter. In the event that it is the defendant who has summary judgment entered against him, the standard would be different. In such an instance, the defendant on appeal would have to show that the trial court judge erred in determining, as a matter of law, that the plaintiff had rebutted the presumption contained in § 11112.

the proposition that whenever a peer review action is taken, the four prongs of § 11112(a) must be complied with in order for the peer review participants to be entitled to immunity under the HCQIA.

■■ We reject this interpretation of *Mathews*. *Mathews* in no fashion stands for the proposition that a professional review action may not be taken prior to the completion of an investigation or to a hearing. Rather, the portion of *Mathews* on which Appellants rely is a discussion of the differences between "professional review *actions*" with "professional review *activities*". *Id.* at 632–634. The *Mathews* court reasoned that professional review actions are those actions which negatively impinge on a physician's clinical privileges; a professional review activity, however, refers to the investigatory process prior to any action being taken against the physician. *Id.* at 634.[3] The *Mathews* court concluded that the professional review event it was examining was merely a "professional review activity" and thus it need not comply with the four prongs of § 11112(a) because no action had yet been taken. The court did not, however, state that a professional review action may never be taken prior to the completion of an investigation or the holding of a hearing.

In fact, such a holding would have been highly peculiar as it would contravene explicit language in the HCQIA. The HCQIA provides that "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, [is permitted] where the failure to take such an action may result in an imminent danger to the health of any individual." 42 U.S.C. § 11112(c)(2).[4] This provision "does not require imminent danger to exist before a summary restraint imposed. It only requires that the danger *may* result if the restraint is not imposed." *Sugarbaker v.*

3. We agree with Appellants that since the February of 1994 actions involved a curtailment of Manzetti's clinical privileges, they are "professional review actions" as defined by *Mathews*.

4. Although the Commonwealth Court below also relied on 42 U.S.C. § 11112(c)(2) in rendering its decision, Appellants have failed even to mention this subsection in their brief, let alone explain to this court how the February of 1994 actions do not fall within its ambit.

*SSM Health Care,* 190 F.3d 905, 917 (8th Cir.1999) (emphasis in the original) (citations omitted).

In the February of 1994 actions, Pellegrini and the MEC expressed grave concerns regarding Manzetti's competence to perform open-heart surgery, an undeniably serious procedure where incompetence on the part of the physician could lead to imminent danger to the health of a patient. Furthermore, Appellants do not dispute that there was subsequent notice and a hearing; in fact, in no part of their brief do Appellants challenge the adequacy of the proceedings held before the hearing panel or the review panel. The February of 1994 actions are therefore squarely within the ambit of 42 U.S.C. § 11112(c)(2). Thus, as the HCQIA specifically allows that protective action such as the February of 1994 actions may be taken prior to notice being given and a hearing being held, Appellants' argument that the February of 1994 actions, in and of themselves, had to comply with § 11112(a)(2) must fail.

Although we have determined that the February of 1994 actions in and of themselves need not comply with § 11112(a)(2), we must still determine whether Appellants' evidence establishes that the entirety of the investigation was so flawed that there was a jury question as to whether Appellees expended a reasonable effort investigating this matter.[5] Appellants have essentially two arguments. First, Ap-

5. At this juncture we note that Appellants also claim that the trial court erred when it examined the peer review proceedings that occurred after February 24, 1994 in rendering its determination. It is Appellants' view that nothing that occurred after February 24, 1994, the date on which the MEC decided to continue Appellants' suspension, can be considered in determining whether Appellees expended a reasonable effort investigating this matter. They claim that

> [u]nder § 11112(b), the affected physician can waive his or her right to a hearing under § 11112(a)(3). Because the physician could waive the hearing and the health care entity would still be required to have complied with § 11112(a)(1), (2), and (4), Mercy cannot claim that the events after February 24, 1994 were part of its investigation.

Appellants' brief at 19.

In essence, Appellants claim that since a physician could have waived his right to a hearing, then a hearing—even when it is held—is rendered nugatory. This argument is nothing short of bizarre. If we were

pellants claim that the investigation was preposterously brief and superficial. Second, Appellants claim that improprieties that allegedly occurred during the February of 1994 actions cast doubt on whether Appellees conducted a reasonable investigation.

In arguing that the investigation was too brief, Appellants cite to several cases that they claim establish that other hospitals conducted longer investigations prior to restricting a physician's privileges. *See, e.g., Mathews, supra* (seventeen month investigation) [6]; *Goodwich v. Sinai Hospital,* 103 Md. App. 341, 653 A.2d 541 (1995) (progressive restrictions placed on physician's privileges over a five year period). The thrust of this position is that since other hospitals conducted longer investigations prior to restricting privileges, then there is a jury question as to whether Appellees conducted a reasonable investigation.

■■■■ This argument must fail. The fact that other hospitals have conducted investigations that are longer in duration than the one conducted by Appellees does not rebut the presumption that Appellees' effort to obtain the facts was reasonable. As eloquently stated by the Commonwealth Court below, "[c]ourts that have considered cases under the HCQIA have not elucidated a litmus test in terms of the duration of an investigation before it is deemed reasonable." *Manzetti,* 741 A.2d at 834. Rather, we must examine the totality of the circumstances presented by each case. As detailed more fully *supra,* the peer review bodies in this matter received testimony from more than twenty witnesses. They also reviewed the charts of many of Manzetti's patients. This is not, as Appellants would have us believe, an example of an unreasonable effort to obtain the facts of the matter. The mere fact that some other hospitals dealing with other physicians performing different types of procedures may have conducted investigations that were larger than the one con-

to accept it, we would in effect render hearings sham operations; we refuse to do that.

**6.** Appellants incorrectly state that the investigation of Mathews was conducted over a thirty-eight month period.

·

ducted here does not rebut the presumption that Appellees expended a reasonable effort investigating this matter.

As an additional argument on this point, Appellants focus on alleged improprieties in the February of 1994 actions. Appellants first claim that the Hetrick and Manning statistical study, on which the MEC's February 24, 1994 action was predicated, was flawed. Recounting at length the testimony provided by Manzetti's experts before the hearing panel, Appellants contend that the methodology by which Hetrick and Manning compiled the statistical data is not one that would be utilized by professional statisticians and therefore their statistical conclusions were unreliable. Appellants contend that Appellees' actions were thus not taken "after a reasonable effort to obtain the facts of the matter". 42 U.S.C. § 11112(a)(2).

■■■ Even assuming *arguendo* that the Hetrick and Manning statistical study did not comport with the standards of professional statisticians, we disagree with Appellants that such evidence reveals that Appellees did not expend a "reasonable effort to obtain the facts". The requirement that the peer review body expend a "reasonable effort to obtain the facts" does not require that the investigation be flawless. Rather, it connotes that the investigation must be conducted in a sensible fashion. An examination of how the Hetrick and Manning statistical study was created reveals that the MEC did not act unreasonably in relying on it.[7] First, Hetrick and Manning gathered as many of the records of Manzetti's open-heart surgeries for 1993 and 1994 that they could obtain. Then, they randomly selected an equal number of cases from other surgeons in the division. At that point, Hetrick and Manning compared Manzetti's cases against the randomly selected cases from other surgeons for key quality indicators such as total anesthesia time and total by-pass and pump time. On its face, the Hetrick and Manning statistical study was

7. Only the MEC relied on the Hetrick and Manning statistical study to support its conclusion. As noted *supra,* the hearing panel specifically stated in its report that it rejected the statistical evidence presented to it.

prepared in a sensible fashion. The fact that it was ultimately discredited by professional statisticians in no fashion renders it unreasonable for the MEC to have predicated its decision on it. *See. Sugarbaker, supra* (even where medical review committee's initial reasons for curtailing physician's privileges were eventually shown to be unfounded, it was not unreasonable for the medical review committee to have relied on these reasons when it suspended the physician's privileges).

Next, Appellants assert that Pellegrini was motivated by self-interest as he was a direct economic competitor of Manzetti's. They contend that this conflict of interest on the part of Pellegrini created a jury question on the reasonableness of the investigation. Even assuming *arguendo* that the evidence adduced by Appellants established that Pellegrini was motivated by self-interest, such evidence would not create a jury question. Like all other evidence of bias or ill will, evidence of a conflict of interest on the part of a participant in the peer review process is immaterial to determining whether a plaintiff has effectively rebutted the presumption of § 11112(a). *See Mathews,* 87 F.3d at 634–36; *Austin,* 979 F.2d at 734.[8]

Appellants' last argument in support of their claim that there was no reasonable effort to obtain the facts in this matter focuses on Pellegrini's letter of February 4, 1994 and the letter confirming the MEC's action of February 11, 1994. Manzetti asserts that these letters contained fabrications in that they referred to the Hetrick and Manning statistical study, a study which had not yet been performed at the time these letters were written. It is true that these letters reference statistical conclusions, including references to the high complication and mortality rate among Manzetti's open-heart surgery patients. Yet the letters do not reference the Hetrick and Manning statistical study and therefore do not

---

**8.** We note that the HCQIA forbids a physician who is in direct competition with the physician being sanctioned from being a member of the hearing panel. 42 U.S.C. § 11112(b)(3)(A)(ii) and (iii). These provisions, however, are not applicable here as Pellegrini was not a member of the hearing panel. *See also Wayne v. Genesis Medical Center,* 140 F.3d 1145, 1149 (8th Cir.1998).

contain the fabrications Appellants allege. We thus conclude that Appellants have failed to show that there was a jury question on whether they had rebutted § 11112(a)(2)'s presumption.

In their next issue, Appellants contend that they adduced evidence showing that Appellees did not have a reasonable belief that suspending Manzetti would further the provision of quality health care. Thus, they argue, there is a jury question as to whether they have rebutted the presumptions contained in § 11112(a)(1) and (a)(4).

In support of this claim, Appellants reference two letters sent by Mercy on April 26, 1994. One of these letters was sent to St. Bernards Regional Medical Center ("St.Bernards") in Arkansas; the other was sent to the Arkansas State Medical Board ("Arkansas Board"). Apparently, these letters were sent after Mercy received inquiries regarding Manzetti's attempt to secure a position with St. Bernards. Each letter noted that Manzetti's privileges to perform open-heart surgery were suspended. Appended to the St. Bernards letter was a list of cardiovascular surgery privileges that Mercy would recommend that St. Bernards grant to Manzetti. On this list, Mercy noted that Manzetti could perform open-heart surgery as long as he had senior help. Furthermore, Mercy stated in the letter to the Arkansas Board that Manzetti's privileges had been suspended as he "had an increased mortality rate and a number of quality issues that may or may not be related solely to his low volume of cases. .... The investigation also revealed lack of documentation of complications in the medical record." Letter from Mercy to Arkansas Board, dated 4/26/1994. The letter also stated that "[i]f senior help is provided during open-heart surgery, Dr. Manzetti can perform open heart [sic] procedures." *Id.*

Appellants claim that Mercy stated in these letters that Manzetti was competent to perform open-heart surgery. Thus, Appellants contend, there are two conflicting accounts: on one hand, Mercy is claiming that it suspended privileges because it reasonably believed Manzetti was incompetent; on the other, there are letters from Mercy in which it claims that

Manzetti is competent. Appellants assert that this conflict creates a jury question about whether Mercy did indeed have a reasonable belief that the facts warranted a suspension of Manzetti's privileges in order to assure the provision of quality health care.

Appellants' argument grossly mischaracterizes these two letters. Mercy's statement that it could recommend that Manzetti be granted privileges to perform open-heart surgery with senior help is not, as Appellants would have it, a glowing endorsement of Manzetti's surgical skills. Rather, it is quite the opposite. The caveat that Manzetti be allowed to perform open-heart surgery only with senior help is a clear statement that he is *in* competent to perform this type of procedure unaided and therefore should not be granted privileges to do so. Thus, these letters do not rebut the presumption that Appellees restricted Manzetti's privileges because of the reasonable belief that the facts as presented to them indicated that such a restriction furthered the provision of quality health care.

 Appellants' final claim is that the trial court improperly truncated discovery proceedings. Specifically, Appellants contend that the trial court refused to allow them to depose seven of the Appellees. They assert that by denying them the opportunity to conduct these depositions, the trial court placed them in a Catch–22 situation: the trial court essentially required them to rely on the allegations contained in their pleadings, and yet Appellants could not merely rely on their pleadings if they were to overcome § 11112(a)'s presumption.

This claim is without merit. First, Appellants' extreme characterization of their situation is inaccurate. They were not, as they contend, forced to rely merely on the allegations contained in their pleadings. In fact, the record of the proceedings before the trial court is replete with evidence introduced by both Appellants and Appellees as to how the peer review process was conducted.

 Appellants seem to presuppose that they should have been allowed unlimited discovery prior to the trial court

being allowed to rule on their summary judgment motion. This is simply not the case. Summary judgment may be entered prior to the completion of discovery in matters where additional discovery would not aid in the establishment of any material fact. *See* Pa.R.C.P. 1035.2(1). Thus, the question is whether additional discovery would have aided in the establishment of any material fact.

Appellants, however, do not explicitly state how additional discovery would have aided them. The nearest Appellants come is hinting that the evidence they wished to discover would have been relevant to showing that the participants in the peer review process acted in bad faith. This does not provide a basis for allowing additional discovery. As discussed *supra*, the HCQIA does not require that participants in the peer review process act with good faith in order to be entitled to a grant of immunity. *See Austin*, 979 F.2d at 734; *see also Mathews*, 87 F.3d at 635. In fact, evidence that the peer review process was conducted due to hostility toward the sanctioned physician is "irrelevant to the reasonableness standard of § 11112(a)." *Austin*, 979 F.2d at 734. Thus, as the evidence that Appellants wished to obtain via discovery would have been irrelevant in determining whether Appellants had rebutted the presumption contained in § 11112(a), then Appellants have not shown that the trial court erred when it refused Appellants the opportunity to depose seven of the Appellees.

For the foregoing reasons, we conclude that the trial court correctly determined that Appellants, as a matter of law, failed to rebut the presumption that the peer review process complied with the dictates of the HCQIA. The order of the Commonwealth Court is affirmed.

Justice Nigro and Justice Newman did not participate in the consideration or decision of this matter.