J-A03044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FRED TEICHMAN, M.D. AND CENTRAL PENN WOMEN'S HEALTH | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : | |
| v. | : | |
| EVANGELICAL COMMUNITY HOSPITAL, MICHAEL N. O'KEEFE, LAWRENCE GINSBURG, M.D., CHRISTOPHER OLSON, D.O., CHRISTOPHER MOTTO, M.D., AND MARIA E. FULLANA-JORNET, M.D. | : | No. 1706 MDA 2018 |

Appeal from the Judgment Entered December 13, 2018
In the Court of Common Pleas of Union County Civil Division at No(s):
13-0840

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:          **FILED: JUNE 25, 2020**

Fred Teichman, M.D., and Central Penn Women's Health (collectively, "Appellants"), appeal from the December 13, 2018 entry of Judgment after the trial court granted Appellees' Motion for Judgment Notwithstanding the Verdict ("JNOV") based on its determination that Appellees were entitled to statutory immunity under the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11101, *et seq*.  After careful review, we affirm.

The relevant facts and procedural history are as follows.  Dr. Fred Teichman ("Appellant") is a board-certified obstetrician and gynecologist. Appellant practiced obstetrics and gynecology at his medical practice,

Appellant Central Penn Women's Health, located in Lewisburg. For more than 30 years, Appellant also had unrestricted clinical staff privileges at Evangelical Community Hospital ("Hospital"). Hospital's bylaws ("Bylaws") govern the relationship between Hospital and its medical staff, including Appellant, and represent the terms of the contract between Appellant and Hospital.

In June 2012, one of Appellant's post-partum patients nearly bled to death ("Post-partum Bleed Incident"). On June 19, 2012, as a result of the Post-partum Bleed Incident and other prior and ongoing issues,[1] Hospital summarily suspended Appellant's clinical privileges pursuant to Section 2.6.2 of the Bylaws. On July 3, 2012, following a meeting of Hospital's Medical Executive Committee ("MEC"), Hospital reinstated Appellant's clinical privileges subject to the condition that Appellant provide a proctor to oversee his patient care at Hospital. Appellant refused to comply with this condition and instead pursued administrative remedies, including an appeal to Hospital's Board of Directors, as prescribed by Article IX of the Bylaws. Appellant was not successful in obtaining administrative relief.

---

[1] These issues, discussed in further detail *infra*, include: (1) Appellant viewing pornographic material on his office computer in 2006; (2) Appellant touching inappropriately a nurse midwife in the operating room; (3) Appellant touching inappropriately and making inappropriate sexual comments to a physician's assistant student; (4) Appellant failing to communicate during surgery; and (5) the "Cytotec" Incident, in which, on January 20, 2012, Appellant prescribed the medication Cytotec, an abortifacient, on an outpatient basis to a pregnant patient who allegedly did not have access to a car or a telephone.

On December 31, 2013, Appellants initiated this action by filing a four-count Complaint against Hospital and the individual defendants[2] (collectively, "Appellees"). Appellants raised a claim of Breach of Contract and for Equitable Relief[3] against Hospital alone, and claims of Tortious Interference with Contract and Civil Conspiracy against all Appellees. Essentially, Appellants alleged that Appellees "engaged in a campaign based on baseless accusations and innuendo to remove Appellant from the staff of [Hospital], strip him of his clinical privileges[,] and destroy his professional practice while violating provisions of the Health Care Quality Improvement Act (HCQIA) (42 U.S.C. § 11101, *et seq*.) and [Hospital's Bylaws]." Trial Ct. Op., 2/26/19, at 2.

On January 31, 2014, Appellees filed an Answer and New Matter asserting that Hospital terminated Appellant's medical privileges following its peer review process and as a result of Appellant's inappropriate medical decisions, his failure to communicate with colleagues during surgery, and his inappropriate comments of a sexual nature to a physician's assistant student. Appellees took the position that they conducted their professional review

---

[2] The individual defendants are: (1) Michael N. O'Keefe, Hospital's President and Chief Executive Officer; (2) Dr. J. Lawrence Ginsburg, Hospital's Vice-President of Medical Affairs; (3) Dr. Christopher Olson, President of Hospital's Medical Staff and the Chair of the Medical Executive Committee; (4) Dr. Christopher Motto, Chair of Hospital's Department of Surgery; and (5) Dr. Maria E. Fullana-Jornet, Chair of Hospital's Obstetrics Committee.

[3] Appellant sought reinstatement to Hospital's medical staff.

activities in compliance with the HCQIA and, therefore, statutory immunity applied.[4]

On January 8, 2018, Appellees filed a Motion to trifurcate the issues for trial. Appellants filed a Motion in Opposition and, following a hearing, on June 13, 2018, the trial court entered an order granting Appellees' Motion. The court limited Phase One of the jury trial to whether Appellees complied with the HCQIA's procedural requirements when taking adverse action against Appellant on June 19, 2012, and July 3, 2012, and, thus, were entitled to statutory immunity.[5] Relevant to the issues raised in this appeal, in response to the parties' numerous pre-trial Motions *in Limine*, the trial court also entered Orders, *inter alia*: (1) precluding the parties from mentioning the Bylaws at the Phase One trial; and (2) permitting witness testimony about Appellant's viewing of pornographic materials in 2006.

On September 4, 2018, Phase One of the trial commenced. The evidence presented at the Phase One trial concerned each of the instances of

_____

[4] Following the close of discovery, on November 28, 2016, Appellees filed a Motion for Summary Judgment. The trial court denied the Motion on November 30, 2017.

[5] If after the jury determined that HCQIA immunity applied, Phase Two would be limited to alleged violations of the Bylaws and equitable remedies, and Phase Three would not be necessary. If, however, the jury found that HCQIA immunity did not apply, Phase Two of the trial could be limited to alleged violations of the Bylaws and Appellants' tort claims, and evidence of animus, bias, bad faith, and unfair competition would be admissible. If the jury or court entered a verdict for Appellants after Phase Two, the court would hold a Phase Three trial to assess damages, and the court would determine equitable relief.

Appellant's alleged misconduct, as well as Appellant's inability to communicate effectively and cooperate with other Hospital staff, and the actions Appellees took before the MEC decided to take adverse action against Appellant on June 19, 2012, and July 3, 2012.

With respect to the Post-partum Bleed Incident, the evidence indicated that Appellee Christopher Motto, M.D., in his role as chair of the Department of Surgery, became directly involved following the incident. In addition, in his capacity as department chair, he directed that Hospital obtain a second opinion about Appellant's actions, and informed Appellant that Hospital would obtain a second opinion at the time of the incident.[6]

Regarding the Cytotec Incident, the evidence showed that Appellee Dr. Fullana-Jornet became directly involved following the incident as chair of Hospital's Obstetrics Committee. Dr. Fullana-Jornet testified that it was inappropriate for Appellant to prescribe Cytotec to a patient and immediately discharge her when the patient did not drive and had no immediate access to a telephone or car. The evidence also indicated that Hospital obtained an outside opinion regarding Appellant's actions in the Cytotec Incident that confirmed that Appellant's actions were inappropriate.

The evidence showed that the information provided by Drs. Motto and Fullana-Jornet to the MEC was critical to the MEC's decision to suspend

---

[6] Ultimately, the physician who rendered the second opinion replaced Appellant as the doctor providing direct care to the patient involved in this incident.

Appellant's privilege on June 19, 2012, and to reinstate them conditionally on July 3, 2012.

The parties also presented extensive evidence about Appellant's alleged inappropriate conduct involving the nurse midwife assisting Appellant with a surgical procedure and the female physician's assistant student. With respect to the former, the evidence indicated that during a surgical procedure Appellant wiped sweat from the top of nurse's breast. With respect to the latter, the testimony indicated that Appellant engaged in a discussion about sexually transmitted diseases with the student using inappropriate vulgar language. Several hospital staff overheard this and reported that Appellant's language and conduct offended them. Subsequently, Appellant sat close to the same student on a gurney in the hallway while engaging her in conversation. The appropriateness of this conduct was also called into question.

There was also evidence that, in 2006, while Appellant was in practice with several other physicians, Appellant viewed pornographic material and adult websites on his office computer. As a result, Appellee Dr. Ginsburg and Appellant's medical partners compelled Appellant to attend a course and obtain an evaluation regarding boundaries and the reason for his conduct. Appellant went to Vanderbilt University for the assessment and Vanderbilt University generated a report ("Vanderbilt Report") and provided it to Appellant, Appellee Dr. Ginsburg, and Hospital. The MEC had access to this information at the time of its decisions regarding Appellant.

Last, Appellees presented evidence that Appellant lacked the ability to cooperate and communicate with Hospital staff. Specifically, in addition to the above, two nurses and an anesthesiologist testified about Appellant's rude and unprofessional treatment of them on several occasions.

Following the presentation of evidence, the court presented the jury with a verdict slip in three separate parts. The first part of the jury slip contained specific questions about the role of Dr. Fullana-Jornet, who was not part of the MEC. The court asked the jury to determine whether Dr. Fullana-Jornet participated with or assisted the MEC when it took adverse action against Appellant on both June 19, 2012, and July 3, 2012.

The second section of the jury slip required the jury to determine: (1) whether on June 19, 2012, the MEC acted after reasonable effort to obtain the facts; (2) whether on June 19, 2012, the MEC acted in the reasonable belief that the action taken by the MEC was warranted by facts known after such reasonable effort to obtain the facts; (3) whether the MEC conducted an investigation after the June 19, 2012 suspension to determine the need for a professional review action; (4) whether, if the MEC had failed to suspend Appellant on June 19, 2012, the failure may have resulted in an imminent danger to the health of any individual; and (5) whether the MEC's June 19, 2012 action was subject to subsequent notice and hearing or adequate procedures.

The third section of the jury slip required the jury to consider, with respect to the MEC's July 3, 2012 conditional reinstatement, whether it acted:

(1) after a reasonable effort to obtain the facts; (2) after adequate notice and hearing procedures were afforded to Appellant under the circumstances; and (3) in a reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain the facts.

The jury returned the verdict slip indicating that it found Dr. Fullana-Jornet did participate or assist the MEC with its June 19, 2012 action, but not with its July 3, 2012 action.

The jury then found that the MEC failed to make a reasonable effort to obtain the facts before taking adverse action against Appellant June 19, 2012.[7] According to the instructions on the jury slip, as a result of answering "no" to this question, the jury should have proceeded to answer the questions relating to the July 3, 2012 incident. Instead, however, the jury answered two other questions related to the June 19, 2012 incident, indicating that it found that if the MEC had failed to suspend Appellant on June 19, 2012, the failure may have resulted in an imminent danger to the health of any individual.

With respect to the July 3, 2012 incident, the jury found that Appellees completely complied with the requirements of the HCQIA in taking its adverse action against Appellant. Accordingly, based on this verdict, the court found that the HCQIA applied to Appellees for the action taken on July 3, 2012, and that, therefore, Appellants were entitled to immunity for all actions taken on or after July 3, 2012.

_____

[7] This finding rendered Appellees ineligible for statutory immunity under the HCQIA.

On September 25, 2018, Appellees moved for JNOV on the jury's verdict that Hospital was not entitled to immunity for the actions it took on June 19, 2012. Appellees argued both that they were entitled to judgment as a matter of law and that no two reasonable minds could disagree that the jury should have entered a verdict for Appellees. With respect to the latter argument, Appellees asserted that the jury's findings—that (1) the MEC did not act after reasonable effort to obtain the facts of the matter and (2) had the MEC not acted, there might have been imminent danger to the health of any individual—were inherently inconsistent findings. They argued that no two reasonable minds could make a factual finding both that Appellant's conduct created a possibility of an imminent danger to a patient, and that Appellees did not undertake reasonable efforts to obtain the facts of the matter. The trial court agreed and determined that the jury's findings with respect to the June 19, 2012 incident were inherently inconsistent. It, therefore, entered a JNOV in favor of Appellees.[8]

Appellants timely appealed the Judgment. Both Appellants and the trial court complied with Pa.R.A.P. 1925.

---

[8] Following entry of JNOV, Appellants elected not to proceed with their outstanding claims for equitable relief. *See* N.T., 9/25/18, at 26. Accordingly, on September 25, 2018, the trial court entered an order indicating that its Order granting JNOV in favor of Appellees was "final and in resolution of this matter." Order, 9/25/18. The court's Final Order, based Appellants election not to proceed with their outstanding claims for equitable relief, eliminated the need to conduct Phases Two and Three jury trials.

Appellants raise the following five issues on appeal:

1. Where there was sufficient evidence to sustain the [j]ury's finding that [Appellees] did not undertake a reasonable effort to obtain the facts of the matter before summarily suspending Dr. Teichman, was it error for the trial court to enter JNOV?

2. Where the June 19, 2012 summary suspension and July 3 modification thereof were part of the same professional review action, and where the [j]ury found [Appellees] failed to fulfill a requirement of the HCQIA in connection with the June 19 action, was it error for the trial court to find [Appellees] immune from liability for any of [Appellants'] damages suffered after July 3, 2012.

3. Did the trial court abuse its discretion in precluding [Appellants'] counsel from cross-examining adverse fact witnesses as to their bias and antagonistic animus toward Dr. Teichman?

4. Where the [b]ylaws governed the parties' conduct and were relied upon by the parties during the entirety of the professional review activities, did the trial court abuse its discretion when it precluded [Appellants] from referencing the [b]ylaws?

5. Did the trial court abuse its discretion when it permitted evidence of 2006 events irrelevant to the reasons for the 2012 summary suspension, and which evidence, given its nature and lack of, or at most, *de minimus*, probative value was far outweighed by the risk of unfair prejudice to [Appellants] and confusion of the issues?

Appellants' Brief at 3-4.

**Issue 1**

In its first issue, Appellants claim that the trial court erred in entering JNOV because the evidence supported the jury's finding that Appellees' efforts to obtain the facts before summarily suspending Appellant on June 19, 2012, were unreasonable. Appellants' Brief at 35 (citing 42 U.S.C. § 11112(a)(2), (4)). The gravamen of Appellants' complaint is that Appellees failed to

- 10 -

comprehensively obtain and review hospital and medical records before suspending Appellant. *Id.* at 38-47. Appellants argue that "it was within the jury's province to [] find [Appellees'] effort unreasonable[,]" and that in granting JNOV the "trial court improperly substituted its own judgment for that of the [j]ury[.]" *Id.* at 40.

Whether the trial court appropriately granted a motion for JNOV is a question of law over which we exercise plenary review. *Rohm and Haas Co. v. Continental Cas. Co.*, 781 A.2d 1172, 1176 (Pa. 2001).

A trial court may enter a JNOV if, after its review of the evidentiary record it concludes that: (1) even with all factual inferences decided adversely to the movant, the movant is entitled to judgment as a matter of law; and/or (2) that the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Id.*

On appeal, "[w]hen we review a motion for JNOV, we must consider the evidence in the light most favorable to the verdict winner, who must receive the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Id.* (citation and internal quotation marks omitted). Questions of credibility and conflicts in the evidence are for the fact-finder to resolve, and we will not reweigh the evidence or substitute our judgment for that of the finder of fact. *Holt v. Navarro*, 932 A.2d 915, 919 (Pa. Super. 2007). "Absent an abuse of discretion, the trial court's determination will not be disturbed." *Id.* (citation omitted).

In 1986, Congress passed the HCQIA to "improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." *Manzetti v. Mercy Hosp. of Pittsburgh*, 776 A.2d 938, 945 (Pa. 2001) (citation omitted). Congress included immunity provisions in the HCQIA that "provide that anyone participating in or aiding a professional review body shall not be held liable in monetary damages for claims arising out of the peer review process." *Id.* (citing 42 U.S.C. § 11111(a)(1)).

Under Section 11112(a) of the HCQIA, immunity applies if a peer review organization undertakes a professional review action: (1) in the reasonable belief that the action was in furtherance of quality healthcare; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). 42 U.S.C. § 11112(a).

The HCQIA further provides that, "if a professional review action . . . of a professional review body meets all the standards specified in [Section] 11112(a)[,] (A) the professional review body, (B) any person acting as a member of staff of the body, (C) any person under a contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any

law of the United States or any State [] with respect to the action . . . ." *Id.* at § 11111.

In the case of health emergencies, the HCQIA immunity provision provides for "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take any such action may result in an imminent danger to the health of any individual." *Id.* at § 11112(c)(2).

The HCQIA includes a presumption that a professional review activity meets the standards for immunity. *Manzetti*, 776 A.2d at 945 (citing 42 U.S.C. § 11112(a)). The plaintiff bears the burden of rebutting the presumption that the peer review process was not reasonable by a preponderance of the evidence. *Id.*

"The reasonableness requirements of [Section] 11112(a) create an objective standard, rather than a subjective good faith standard." *Id.* (citation and internal quotation marks omitted). "[T]his inquiry is whether a person presented with the same information that was placed before the peer review body would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients. This inquiry examines the totality of the circumstances." *Id.* at 946. Evidence that the peer review body conducted its inquiry as a result of hostility or bias toward the sanctioned physician is irrelevant "to the objective test of whether the professional review action was reasonable." *Babb v. Centre Community Hosp.*, 47 A.3d 1214, 1226 (Pa. Super. 2012).

"The proper focus for [the factfinder] was whether, viewing all of the evidence available to it, the peer review body conducted a fair proceeding, made a reasonable effort to obtain the facts[,] and possessed a reasonable belief its action was in furtherance of patient care." *Id*. "Absent such fair proceeding, reasonable effort or reasonable belief, immunity will not attach." *Id.*

Here, the evidence showed that Appellees primarily based their initial decision to summarily suspend Appellant on three distinct grounds: (1) the risk of harm to patients from Appellant's poor decision-making in the Post-partum Bleed and Cytotec Incidents; (2) the risk of harm to patients from Appellant's failure to communicate with Hospital physicians and other staff; and (3) the risk of harm to patients from Appellant's inappropriate comments to and touching of Hospital employees.

Instantly, the trial court determined that the entry of JNOV on the issue of immunity was appropriate because Appellees were entitled to judgment as a matter of law and because no two reasonable minds could disagree that the jury should have entered a defense verdict. Trial Ct. Op., 2/26/19, at 12. In other words, the court found that, based on the evidence, no reasonable jury could have found that Appellees did not conduct a reasonable investigation before summarily suspending Appellant on June 19, 2012, and, thus, as a matter of law, immunity applied.

Specifically, the court noted that the two primary issues concerning the MEC on June 19, 2012, were the Cytotec and the Post-partum Bleed Incidents,

- 14 -

and the evidence showed that Dr. Motto and Dr. Fullana-Jornet became directly involved in handling those incidents, and that information gathered from Dr. Motto and Dr. Fullana-Jornet informed the MEC's June 19, 2012 decision. *Id.* at 4-5. Given this, and (1) the testimony that the MEC sent for an out-of-hospital third-party evaluation of Appellant's conduct, (2) Dr. Fullana-Jornet's and Dr. Motto's testimony that they believed Appellant's decisions had been threatening patient safety, and (3) the testimony from Appellant's co-workers about Appellant's attitude and cooperation level, the court concluded that no two reasonable minds could conclude that the MEC had not made a reasonable effort to obtain information necessary to make its June 19, 2012 decision. N.T., 9/25/18 at 23-24. **See also** Trial Ct. Op. at 13.

Further, the trial court noted the inconsistency in the jury's finding that the MEC did not conduct a reasonable investigation regarding the June 19, 2012 action, but did conduct a reasonable investigation regarding the July 3, 2012 action. In particular, the court observed that "[t]he testimony was that the vast majority of the information gathered by the MEC occurred prior to June 19th. There was some [information gathered] after June 19th[,] but between [June 19th and] July 3rd not nearly as much [] occurred [as] prior to June 19th. In spite of that, the jury concluded that on [] July 3rd the MEC made a reasonable effort to obtain the facts." N.T., 9/25/18, at 23.

In sum, the trial court found that it "defied logic" to conclude that Appellees did not make a reasonable effort to obtain information before acting on June 19, 2012, especially in light of the jury's specific finding that "had the

MEC not suspended [] Appellant on June 19, 2012, there may have been imminent danger to the health of any individual." Trial Ct. Op. at 13. Thus, it concluded that no two reasonable minds could disagree that the evidence showed that Appellees' made a reasonable effort to obtain information before summarily suspending Appellant on June 19, 2012.

Viewing all of the evidence and all reasonable inferences therefrom in the light most favorable to Appellant as the verdict-winner, we conclude that the trial court did not abuse its discretion in determining that the evidence demonstrated that Appellees made a reasonable effort to obtain the facts prior to summarily suspending Appellant's privileges. Accordingly, the trial court properly concluded that Appellees were entitled to judgment as a matter of law on the issue of statutory immunity for the actions they took on June 19, 2012.

**Issue 2**

In their second issue, Appellants claim that the trial court erroneously found Appellees immune from damages that Appellants suffered after July 3, 2012. Appellants' Brief at 47. Asserting the theory that the court should have considered the June 19, 2012 and July 3, 2012 actions "as a whole," they argue that, because the jury determined that Appellees were not entitled to immunity for the action they took on June 19, 2012, it never should have reached the question of Appellees' entitlement to immunity for the July 3, 2012 action. *Id.* Appellants are not entitled to relief on this claim.

The jury's finding that Appellees were entitled to statutory immunity for the July 3, 2012 action and the trial court's entry of JNOV as to Appellees' immunity for the June 19, 2012 action, which conferred statutory immunity on Appellees for the June 19, 2012 action, has resulted in a finding of immunity for all defendants for both actions. Accordingly, any claims arising from the jury's initial finding that Appellees were not entitled to immunity for the June 19, 2012 action are moot.[9]

**Issue 3**

In their third issue, Appellants claim that the trial court erred by precluding them from cross-examining witnesses about their bias or animus towards Appellant. Appellants' Brief at 53-56. Appellants assert that they are not challenging the trial court's order precluding them from arguing that Appellees rooted their action against Appellant in bias or animus.[10] *Id.* at 55-56. Rather, they aver that the court's ruling prevented them from generally undermining the credibility of Appellees' witnesses by exposing those witnesses' biases. *Id.* at 56. Appellants argue that they were unfairly

---

[9] To the extent that Appellants challenge the court's failure to treat the June 19, 2012 and July 3, 2012 actions as separate and distinct, our review of the Record indicates that Appellants have waived this issue by not raising it before the trial court. *See* Pa.R.A.P. 302 ("[I]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."). *See also Jones v. Ott*, 191 A3d 782, 787 (Pa. Super. 2018) ("In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record.").

[10] As noted *supra*, evidence of ill will, bias, economic competition, or bad motive on the part of Appellees was not relevant to the jury's consideration of Appellees' HCQIA immunity. *Babb*, 47 A.3d at 1226.

prejudiced by the court's preclusion of evidence of Appellees' bias against Appellants because it "handcuffed [their] ability to expose [Appellees'] lack of reasonable effort to obtain the facts of the matters relied on *and* lack of credibility on other material matters[.]" ***Id.***

We review the trial court's ruling on the admissibility of evidence for an abuse of discretion. ***Phillips v. Lock***, 86 A.3d 906, 920 (Pa. Super. 2014). We will not overturn such a ruling absent an abuse of discretion or misapplication of law. ***Id.***

Evidence is relevant if it has "any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." Pa.R.E. 401. Irrelevant evidence is inadmissible, and all relevant evidence "is admissible except as otherwise provided by law." Pa.R.E. 402. However, relevant evidence may be excluded "if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Pa.R.E. 607(b) provides that "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, **except as otherwise provided by statute** or these rules." Pa.R.E. 607(b) (emphasis added). ***See Commonwealth v. Birch***, 616 A.2d 977, 978 (Pa. 1992) (explaining that evidence demonstrating a witness's interest or bias is admissible for impeachment purposes).

Under the HCQIA, a party's motivation is "irrelevant to the objective test of whether the professional review action was reasonable." **Babb**, 47 A.3d 1226 (citing 42 U.S.C. § 11112(a)). Thus, "in an HCQIA action, plaintiffs are not permitted to introduce evidence of bad faith of the participants in the peer review process." **Manzetti**, 776 A.2d at 945.

Appellants have asserted that, as an exception to the HCQIA's well-settled rule, evidence of Appellees' ill will or bias is admissible for purposes of impeachment. They have not, however, supported this argument with citation to any controlling case law and our review has found none. Because evidence of a party's motivation is inadmissible under the HCQIA without exception, Appellants' claim fails.

**Issue 4**

Appellants next challenge the trial court's evidentiary ruling precluding the parties from referring to the Bylaws. Appellant's Brief at 56-61. Appellants assert the court improperly excluded reference to the Bylaws because, as the contract between the parties, they served as the basis for Appellant's conduct and provide necessary context to understanding it. **Id.** at 56-57. Appellants have waived this issue.

The Notes of Testimony from the July 9, 2018 hearing on the parties' Motions *in Limine* reflect that the court and the parties discussed whether the court would permit testimony about the Bylaws, and that the parties **all** agreed that the Bylaws were not admissible to show compliance with or violation of the HCQIA—the precise and exclusive subject of Phase One of the

trifurcated trial.[11]  N.T., 7/9/18, at 54-55.  *See also id.* at 57 (where the court ruled that the parties could not testify as to the contents of the Bylaws and that, whether the parties' actions, including those of Appellant, were consistent with the Bylaws was irrelevant to whether Appellees complied with the HCQIA).  The Notes of Testimony reflect the parties' consensus that "no testimony about the bylaws comes in in phase one." *Id.* at 61.  Having agreed prior to trial with Appellees and the court that the parties were precluded from referencing the Bylaws at trial, Appellants cannot now complain that the trial court erred in its ruling.  *See* Pa.R.A.P. 302 ("[I]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal.").  *See also Jones*, 191 A.3d at 787 ("In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record.").  Accordingly, Appellants have waived this issue.[12]

**Issue 5**

In their final issue, Appellants challenge the trial court's evidentiary ruling that permitted the admission of evidence pertaining to Appellant's 2006

---

[11] The trial court's June 12, 2018 Order precluding testimony about the Bylaws reflects this agreement.

[12] Moreover, because the propriety of Appellant's conduct was not at issue in Phase One of the trifurcated trial, whether his conduct was in conformance with or informed by the Bylaws was irrelevant.  Therefore, to the extent that Appellant sought to use the Bylaws to explain his behavior, the Bylaws were likewise irrelevant.

viewing of pornography from his office computer.[13]  Appellants' Brief at 61-66.  Specifically, Appellants argue that the court should have excluded evidence pertaining to the 2006 pornography viewing, including the Vanderbilt Report, as irrelevant and more prejudicial than probative.  They assert that Appellees' proffered evidence in support of their assertion of statutory immunity indicates that "the 2006 matters had *no bearing whatsoever* on [Appellees'] determination to summarily suspend [Appellant's] clinical privileges on June 19, 2012[,] or to modify the terms on July 3, 2012." ***Id.*** at 63-64 (emphasis in original).

In denying Appellants' Motion *in Limine*, the trial court rejected Appellants' argument and found that Appellant's 2006 conduct was relevant because it influenced Appellees' 2012 decisions.  Trial. Ct. Op., 8/15/18, at 2-3 (quoting Appellees' Answer to Appellants' Motion *in Limine* where Appellees asserted that: (1) the "incidents which occurred in 2012 were both a continuation of his prior difficulties (boundaries and communication), and a worsening of those issues;" and (2) several of the parties present at the 2012 MEC meetings "were aware of or participated in addressing the 2006 occurrence").  The court also noted that Appellees referenced Appellant's "inappropriate actions and comments of a sexual nature on the hospital premises, which was witnessed by other staff" as the basis for the MEC action when informing Appellant in its June 19, 2012 letter to him. ***Id.*** at 4.

---

[13] The trial court preliminarily addressed this issue in its August 15, 2018 pre-trial Order, and made a final ruling during trial on September 14, 2018.

The trial court revisited this issue on the record during trial. *See* N.T., 9/14/18, at 3-8. The trial court noted that the evidence Appellants sought to preclude had been included in the binder of information compiled by Appellees and presented to the MEC for its consideration and to Appellants upon Appellants' prior counsel's request to provide the information upon which Appellees would rely in making its decision. *Id.* at 4-5. *See also* N.T., 9/13/18, at 208. The trial court found, based on the testimony to that point, that Appellant's "sexual issues were very much an issue for the MEC and [Appellees]." N.T., 9/14/18, at 6. The court concluded, therefore, that "the Vanderbilt assessment and the language regarding the viewing of pornography and the language that follows [] – and the fact that it was in the binder given to [Appellant - ] is clearly relevant to the notice and [Appellees'] reasonable beliefs that their actions were warranted." *Id.* at 7.

Having found evidence of the 2006 pornography incident and the Vanderbilt Report relevant, the trial court also addressed whether its probative value outweighed its potential prejudice to defendant. The court concluded that the evidence of the 2006 pornography viewing and the subsequent Vanderbilt Report "would not inflame the [j]ury [so that it would] make a decision based on something other than legal propositions." *Id.* at 7-8. *See also* Trial Ct. Op., 8/15/18, at 4-5. Further, we observe that because the 2006 behavior was considered as part of the totality of Appellant's misconduct, its probative value outweighed any prejudice.

- 22 -

Our review indicates that the trial court did not abuse its discretion in denying Appellant's Motion *in Limine* and permitting the admission of evidence pertaining to Appellant's admitted viewing of pornography in his office 2006. Accordingly, Appellants are not entitled to relief on this claim.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>06/25/2020</u>